THE UNITED STATES, APPELLANTS, v. THE MAYOR, ALDERMEN, AND INHABITANTS OF THE CITIES OF PHILADELPHIA AND NEW ORLEANS.

The decision of this court in the United States v. Reynes (9 Howard, 127), again affirmed, to wit, that under the acts of Congress of May 26, 1824 (4 Stat. at Large, 52), and June 17, 1844 (5 Stat. at Large, 676), the courts of the United States have no power to decide upon complete or perfect titles to land.

The contract made between the Baron de Bastrop and the Spanish government did not vest a perfect title in Bastrop, and therefore this court can exercise jurisdiction over the claim.

The grant of twelve leagues square, given to Bastrop by the Spanish governor, only pointed out the place where the families were to settle which Bastrop was to bring in. The land was destined and appropriated to this purpose. There were to be five hundred families, who were to grow wheat, and Bastrop's interest was intended to be in the monopoly of manufacturing flour and exporting it to Havana and other places under the jurisdiction of the Spanish crown. With this view, he obtained separate grants for the bayous or mill-seats, and was bound to erect at least one mill within two years from the date of the grant.

The families which were introduced took their titles from the Spanish government, and not from Bastrop.

This case stands upon the same ground as the case of the United States *v.* King et al., 7 Howard, 833.

This was an appeal from the District Court of the United States for the District of Louisiana.

It was a petition filed by the corporate authorities of the cities of Philadelphia and New Orleans, claiming a large body of land under a grant alleged to have been made by the Baron de Carondelet, the Spanish governor of Louisiana, in 1796 and 1797, to the Baron de Bastrop.

All the title-papers are set forth in the opinion of the court, and it is unnecessary to repeat them. The derivation of title to the petitioners in this case is explained in their petition, which, being short, may be inserted.

"To the Honorable T. H. McCaleb, Judge of the District Court of the United States for the District of Louisiana.

"The petition of the Mayor, Aldermen, and Citizens of Philadelphia, and of the Mayor, Aldermen, and Inhabitants of the City of New Orleans, respectfully represents:

"That in the year 1795 or 1796, in the now State of Louisiana, of which the Baron de Carondelet was governor-general and vice-patron, a grant was made to the Baron de Bastrop, by the proper authorities, of a certain tract of land, twelve leagues square, lying on the Ouachita and Bayou Siard, to be located and surveyed, which was done in due and legal form, as by the annexed plot of survey, marked A, will more fully appear, which was afterwards approved and confirmed; your petitioners, for fuller information, refer to the documents published by authority of Congress, in Vol. II. State Papers, title Public Lands, page 772, No. 40 ; as also to the volume of land laws, published by Matthew St. Clair Clarke, page 951, &c., &c.

"Your petitioners further show, that on or about the 25th day of January, 1804, the said Baron de Bastrop conveyed to a certain Abraham Morehouse two thirds of the said tract, which was afterwards, by a compromise between the said Bastrop, Morehouse, and a certain Charles Lynch, modified so that Morehouse became entitled to four tenths, and Lynch to

six tenths of said grant; which said six tenths were afterwards conveyed to Edward Livingston, on the 18th day of September, 1807, as by documents marked B, C, D, E, and F, respectively, will appear.

"And they also show, that on or about the 5th day of March, 1810, at a sale made by order of T. C. Lewis, parish judge of the parish of Ouachita, 50,000 acres of the part assigned, and belonging to Abraham Morehouse, were seized and sold for taxes, when a certain Andrew Latting became the purchaser, and afterwards transferred to Andrew Morehouse and George Y. Morehouse, sons and lawful heirs of the said Abraham, and to Sophia L. Morehouse, Charles F. Morehouse, Ann M. Morehouse, and Eliza C. Morehouse, children also of the said Abraham, each the amount of 8,000 acres out of the 50,000 sold for taxes. That in 1813, the said Morehouse died, and thereby the remainder of the said property passed to his wife, Abigail Young, and her two sons, Andrew and George, and that on or about the 13th of January, 1824, Stephen Girard purchased the shares of said Sophia L., Charles F., Ann M., and Eliza C.; and in May, 1825, he purchased of George the 8,000 so to him conveyed; that the 2,000 remaining were, by the said Latting, sold to Nathan Morse, in his own right and as attorney for R. R. Goelet, who conveyed the same to a certain Thomas Lovell, who sold them to Stephen Girard, as will more fully appear by the documents herewith filed, and marked G, H, I, J, K, KK, L, M, N, O, P, Q, R.

"That in the autumn of the year 1815, Andrew, the elder son, died, unmarried and without issue, whereby his estate passed to his mother, Abigail, and his surviving brother, George.

"That the said George, as well in his own right as in virtue of a power of attorney, duly executed by his mother, Abigail, constituted and appointed a certain William Griffith, of Burlington, in the State of New Jersey, their agent and trustee, for the purpose of selling and disposing of their interest in the said lands, which he accordingly did, on or about the 29th of January, 1822, to the said Stephen Girard, James Lyle, and Robert E. Griffith; as also of 10,000 acres of the same parcel, held by the said Wm. Griffith and Richard S. Coxe, of Georgetown, District of Columbia, about the 23d of January, 1824; that afterwards, viz. at the October term, 1827, of the Seventh Judicial District Court, in the parish of Ouachita, a partition was decreed between the said Girard, Lyle, and Griffith, whereby the portion of Girard was separated and set apart, as by said decree and the documents marked Q, R, S, T, U, V, W, and X, herewith filed, will more fully appear. And your

petitioners further show, that the portion assigned, as above stated, to Edward Livingston, an amount of 12,500 acres, was, by the said Girard, purchased, as per act herewith filed, and marked AA, about the 6th of November, 1819, from a certain John Carrier, of Baltimore, who purchased it from Samuel McKean of said city, being part of a larger parcel conveyed by the said Edward Livingston to Stephen Wante, by act marked CC.

" And they further show, that on or about the 22d of November, 1824, the said Stephen Girard purchased from John Hughes, of the parish of Ouachita, 4,300 acres of the same land, which said Hughes had purchased at sheriff's sale, being a part of that assigned to Andrew Morehouse, as appears by the document marked DD, herewith filed.

" And they further show, that on or about the 9th day of February, 1824, the said Stephen Girard purchased at sheriff's sale, in the case of Brooks, Syndic, v. G. Hamilton, 23,694 acres, which the said Hamilton purchased from Andrew Y. Morehouse, as by document EE, herewith filed, more fully appears.

" That on or about the 11th day of February, 1825, the said Stephen Girard purchased from Cesar McGlaughlin 4,000 acres of the same parcel, which the said McGlaughlin had purchased at the sheriff's sale in the said suit of Brooks, Syndic, v. Hamilton, which land the said Hamilton had acquired from the said Andrew Morehouse, in proof whereof he files the document FF.

" That on or about the 29th of September, 1807, the said Edward Livingston transferred to John Adair a portion of said lands, amounting to 75,000 acres.

" That on or about the 17th of October, 1807, the said John Adair conveyed to T. B. Franklin, of Ouachita, 2,340 acres of said land; and by act bearing date 11th February, 1828, the said T. B. Franklin conveyed the same to Stephen Girard, as per acts marked GG, HH, II, herewith filed, will more fully appear.

" That by act bearing date 23d February, 1808, the said Adair sold to Curry 10,000 acres of this part, which Curry conveyed to the said Girard on or about the 9th day of March, 1829; and, lastly, that on or about the 10th day of July, 1827, the said John Adair conveyed his remaining interest, amounting to 36,549 arpents, to the said Stephen Girard, whereby the latter became possessed of all the portion conveyed by the said Edward Livingston to the said John Adair; all which will more fully appear by documents LL, MM, and NN.

" Your petitioners further show that the said Stephen Girard, having first made his will, departed this life on or about the    day of

" That by his said will, which has been duly proved, and a copy of which is herewith filed, and marked O O, he bequeathed to your petitioners the whole of his above-described property; from all which acts and deeds it results that your petitioners are the true and lawful owners of the said above-described portions of the Bastrop grant; they allege that there is no other person or persons claiming the same, or any part thereof, by a different title from that of your petitioners; nor are there any person or persons holding possession of any part thereof otherwise than by the lease or permission of your petitioners. But that the United States deny their title thereto, and claim the whole of the lands contained within the said Bastrop grant as part of the public domain.

" That the said title of the Baron de Bastrop has been partially submitted to the board of land commissioners, and by them reported on unfavorably.

" Wherefore your petitioners pray that the validity of their title may be inquired into and decided upon; to which purpose the United States may be cited by their representative, the district attorney, and that they may be confirmed in their said title, with all other and further relief.

" GEO. STRAWBRIDGE,<br>P. SOULÉ,

Of counsel for the cities of Philadelphia and N. Orleans."

There were ninety-six pages of exhibits filed with the petition. It is not necessary to give the substance either of them or of the testimony which was afterwards collected by the petitioners and the United States, because the question was decided entirely upon the construction of the grant.

In the progress of the case an order was made, on the motion of the claimants, for a jury to try certain disputed facts, the court reserving to itself " the decision upon the question of the validity or sufficiency of said grant under the colonial laws and regulations of Spain, in force in Louisiana at the date of the grant."

On the 8th of December, 1847, the following proceedings took place.

" The trial of this cause was to-day resumed. The argument for the plaintiffs was opened by H. Strawbridge, Esq., and closed by P. Soulé, Esq.; for the defendants, by Thomas J. Durant, United States District Attorney. The argument being closed, the court charged the jury; Silvain Peyroux being appointed foreman, they retired to consider of their verdict.

" After consultation, they returned into court with a verdict in the words and figures following, to wit : —

" From and according to the evidence adduced in this case, we, the jury, find the following verdict : —

" 1. That, in the year 1796 and 1797, a grant of twelve leagues square of land, on the waters of the Bayou Liard or Siar and its vicinity, has been made by the Baron de Carondelet, as Governor-General of Louisiana, in favor of the Baron de Bastrop (according to the copies and plans thereof produced by the plaintiffs in evidence).

" 2. That the location of said grant was, in pursuance of the orders of said governor, designated by Don Juan Filhiol, commandant of Ouachita, or by Don Carlos Laveau Trudeau, Surveyor-General of the Province of Louisiana ; and that said Baron de Bastrop did, with the consent and approbation of the grantors, take possession of the land so granted, and proceed in carrying out the objects of said grant.

" 3. That the conditions annexed to said grant, particularly that of introducing a given number of families and settling them on said grant, were fulfilled as far as the government could allow the said Bastrop, and that if said conditions were not fulfilled in whole, the non-fulfilment thereof was owing to the act and order of the grantors.

" 4. That a plan of survey of said grant was made by Carlos Laveau Trudeau, Surveyor-General of the Province of Louisiana, and was confirmed in the year 1797 by the Baron de Carondelet, Governor-General of said Province.

                    " SILV. PEYROUX *Foreman of the Jury.*
" *New Orleans*, 8th *December*, 1847."


The cause was then taken up by the court.   The attorney for the United States filed a supplemental answer, denying the right of the petitioners, to which a general replication was put in.

On the 23d of March, 1848, the trial of the cause was commenced before the court ; the testimony was submitted to the court, and the argument of counsel on the part of the plaintiffs and defendants was concluded.

On the 31st of May, 1848, the following judgment was rendered, and entered of record : —

" This cause came on to be heard at the December term of the court, and was argued by counsel ; and thereupon, upon an attentive consideration of the law and evidence, and the court being satisfied that the concession of twelve leagues square of land, situated on the waters of the River Ouachita and the

Bayous Bartholomew and Siard, in the Province of Louisiana, made in the years 1796 and 1797, by the Baron de Carondelet, then Governor-General of said Province, to the Baron de Bastrop, and commonly known as the "Bastrop grant," was a good, valid, and lawful grant to the said Baron de Bastrop, by a legal title in form, made by the Spanish authorities, and was protected and secured to him as his private property by the treaty between the United States and the French republic of the 30th of April, 1803.

" That the mayor, aldermen, and inhabitants of the cities of Philadelphia and New Orleans have proved a good title in themselves to those portions of said ' Bastrop grant' claimed in their petition, derived by various mesne conveyances from the original grantee and owner, the Baron de Bastrop.

" It is ordered, adjudged, and decreed, that the mayor, aldermen, and inhabitants of the cities of Philadelphia and New Orleans, in their several corporate capacities as cities, be declared the true and lawful owners of, and entitled to recover from the United States, the following-described tracts of land situated within the limits of the said grant, and be for ever quieted and confirmed as against the United States in the ownership and possession of the same, to wit : —

" Thirty-two thousand arpents of land acquired by Stephen Girard from Charles F. Morehouse, Ann M. Morehouse, Lucretia C. Morehouse, Eliza C. Sterling, and the heirs of Sophia L. Morehouse, by act of the 13th of January, 1824, before Oliver J. Morgan, parish judge and *ex officio* notary public for the parish of Ouachita.

" Two thousand arpents of land, more or less, acquired by Stephen Girard from Thomas Lovell, by act of the 9th of March, 1825, acknowledged before C. Pollock, notary public in and for the city of New Orleans, and ratified by said Lovell by act of the 3d of October, 1826, before Samuel G. Raymond, notary public in and for the State of New York.

" Eight thousand arpents of land acquired by Stephen Girard from George Y. Morehouse and Martha, his wife, by act of the 28th of April, 1825, before Thomas Adams, notary public in and for the State of New Jersey, at Burlington, in said State.

" Seventy-four thousand one hundred and sixty-seven arpents of land, more or less, acquired by the said Stephen Girard by a decree of partition between said Girard, James Lyle, and Robert E. Griffith, rendered in the year 1827 at the October term of the Seventh Judicial District Court for the parish of Ouachita, by the Honorable J. H. Overton, judge, in the suit entitled Stephen Girard *v.* Robert E. Griffith and the Representatives of James Lyle. The whole, according to the judgment and figurative plans of partition, filed in the aforesaid suit.

" All the share of Stephen Girard (ten twenty-first parts) in that part of four hundred and twenty-six thousand arpents of land, more or less, which has not been comprised in the aforesaid decree of partition, rendered in October, 1827, and which was acquired by Stephen Girard, James Lyle, and Robert E. Griffith, as tenants in common, from George Y. Morehouse and Abigail Morehouse, and their trustee William Griffith, by conveyance of the 29th of January, 1822, acknowledged on the same day before Thomas Adams, notary public in and for the State of New Jersey, at Burlington, in said State.

" Twelve thousand five hundred arpents of land acquired by Stephen Girard from John Carriere and Mary, his wife, by act of the 6th of November, 1819, before John Gill, notary public at Baltimore, in the State of Maryland.

" Four thousand three hundred arpents of land acquired by Stephen Girard by virtue of an act made before Oliver J. Morgan, parish judge and *ex officio* notary public for the parish of Ouachita, on the 22d of November, 1824.

" Twenty-three thousand nine hundred and sixty-four arpents of land acquired by Stephen Girard from George Hamilton, by virtue of a judicial sale thereof made by Jonathan Morgan, sheriff of the parish of Ouachita, on the 9th day of February, 1825, by virtue of a writ of execution issued at the suit of the syndics of Edward Brooks.

" Four thousand arpents of land acquired by Stephen Girard from Cæsar McLauchlin by act of the 11th of February, 1825, before Oliver J. Morgan, parish judge and *ex officio* notary public for the parish of Ouachita.

" Two thousand three hundred and forty arpents of land acquired by Stephen Girard from Thomas B. Franklin, by private act of the 11th of February, 1828, recognized on or about the 14th of March, 1828, before Oliver J. Morgan, parish judge and *ex officio* notary public for the parish of Ouachita.

" Thirty-six thousand five hundred and forty-nine arpents of land, more or less, acquired by Stephen Girard from John Adair, by act of the 10th of July, 1822, before Oliver J. Morgan, parish judge and *ex officio* notary public for the parish of Ouachita.

" Ten thousand acres of land acquired by Stephen Girard from John Casey, by act of the 9th of March, 1829, before Oliver J. Morgan, parish judge and *ex officio* notary public for the parish of Ouachita. Judgment signed June 12th, 1848.

" THEO. H. McCALEB, *U. S. Judge.*"

From this decree the United States appealed to this court. The appeal was argued by *Mr. Crittenden* (Attorney-General),

The United States v. Philadelphia and New Orleans.

for the United States, and by *Mr. Strawbridge* and *Mr. Soulé*, on behalf of the appellees, with whom was *Mr. John Sergeant*, representing the city of Philadelphia.

*Mr. Crittenden* made the following points.

1st. That the original concession to Bastrop (if any was ever made), or if not the original, then at least an official and authentic copy thereof, ought to have been produced, and was indispensable and essential to the maintenance of the claim of the complainants, and that without it their bill ought to have been dismissed.

2d. That the testimony which was offered and admitted for the purpose was inadmissible, and if admissible, was insufficient to establish the alleged grant to Bastrop, to prove its loss, or to warrant the introduction of secondary evidence for proof of said grant. The more, especially, as the claimants had not, in their petition, alleged its loss, or their inability to produce it, and had not, therefore, by their allegations, laid any foundation for the introduction of the testimony they were allowed to give.

3d. That the evidence which was offered and admitted to go to the jury, as to the former existence of said grant, or as to its loss, was illegal, and ought not to have been admitted on the trial; and, furthermore, that the verdict is not warranted by the evidence, and is in itself bad; finding conclusions of law, instead of matters of fact.

But, 4thly and chiefly, it will be insisted that the concession relied on by the claimants is not a concession to Bastrop, under whom they claim, and confers on him no title to the land in controversy. It is in its object and purpose, and in all material particulars, if not in terms and words, identical with that which was relied upon as a concession to the Marquis de Maison-Rouge, in the case of the United States *v.* King and Coxe, and was therein adjudged and decided by this court not to be a grant or concession to the said Maison-Rouge. 7 How. 833. The decision made in respect to the Maison-Rouge concession is supposed to be in point, and decisive against the pretended concession to Bastrop, and against the present claimants.

In addition to his own argument, *Mr. Crittenden* sanctioned and adopted the following view, prepared by the District Attorney, which the reporter prefers to his own notes of the oral argument.

Every plaintiff who brings his suit against the United States under the act of 26th May, 1824, must show a claim to land founded either on a grant, concession, warrant, or order of

52*

survey. The plaintiffs here allege their claim to be founded on a grant from the Baron de Carondelet to Bastrop; and if he made such a grant, it can scarcely be denied that their claim is good. His authority was competent; the date of the instrument brings it within the time prescribed by the first section of the act above quoted, and Bastrop was an inhabitant of the province at the time. It is believed that a fair examination of the instrument relied on will bring us to the conclusion, that there was not, and was not intended to be, any grant of land person-ally to Bastrop; and that he himself never asked for any land; that what is alleged to be a grant of land to Bastrop is, in truth, nothing but a contract entered into with him by the colonial government, whereby, for certain benefits and advantages stipulated in his favor, he was to undertake the personal trouble of bringing into the province, at the expense of the government, five hundred families of French royalists, to be settled on a defined tract of country, twelve leagues square, for the purpose of cultivating wheat; each of the families to receive a grant of four hundred arpents of land, and Bastrop to enjoy the monopoly of grinding the wheat at the flouring-mills he had already established on the Ouachita, and exporting flour free of duty to Havana; but not the slightest mention is made, either expressly or by implication, of any land granted to Bastrop himself.

The documents on which this claim rests, besides being in the record as already noted, may be found in a convenient shape in Matthew St. Clair Clarke's compilation of the laws of the United States in relation to Public Lands. Washington, Gales & Seaton, 1828, p. 951 et seq.

The first is the petition of Bastrop to Carondelet. This states Bastrop's intention of proceeding to the United States to procure the emigrant families; urges the necessity of the goverment's designating a district twelve leagues square, in which the families should be placed; points out the object of their introduction, to cultivate wheat and prevent the introduction of negroes; asks permission to export the flour to Havana; and declares that the government should pay the expenses of bringing in the families.

Now, this is not a petition for a grant of land, nor any thing like it; there are no words in the document by which the Baron de Carondelet, or any one else reading it, could possibly understand that Bastrop desired any land for himself. It will be seen by it that Bastrop had formed an establishment on the Ouachita. " The introduction of negroes and the making of indigo in that district," he says, " would cause your petitioner irrevocably to lose the expenses of his establishment." His

object is to increase the population in the vicinity with such settlers as would be useful to him, viz. those who cultivate wheat; a grant of land, no matter how large, to himself would not answer his purpose; it is not land he wants, but families; and he has not means, a royalist refugee himself, to bring these families into the province; he therefore prays the government to pay the expenses of their transportation hither. But the families themselves would not come simply for the purpose of promoting the interested views of Bastrop. What then? He prays the government to induce them to come by a gratuity of four hundred arpents of land to each family. It is plain, then, that Bastrop does not ask for any land for himself in so many words, nor does he by implication; but he asks that concessions should be made to the settlers. Now, had he intended to ask for the land for himself, why should he pray that the government should make concessions to the settlers out of the very land which was all to be given to him, and when he himself could, if his pretended prayer were granted, give them as much as he pleased himself? With what grace could he think of asking for so unusual and enormous a grant of land for himself, when not only was he offering to do nothing personally for the government, but is calling upon it to incur heavy expenses in bringing in the immigrants, whose labor was to be highly beneficial to himself, and to grant him peculiar commercial favors and privileges not accorded to other inhabitants of the province. Bastrop, then, asks for no land for himself. Does Carondelet grant him any?

The next document (on page 952) will answer. It is the decree of Carondelet on the foregoing petition, and, as was usual, indorsed on the petition itself. Its terms are entirely responsive to the prayer. There is not one of them, and no word of them, indicating a grant of land to Bastrop himself personally, or insinuating in the lightest degree that Carondelet supposed that Bastrop had asked him for any land. He recognizes the advantages which will flow from Bastrop's project; directs the commandant of Ouachita to designate the twelve leagues square, — not *which are to be granted to Bastrop*, and such would have been the expression had a grant been intended, — but "for the purpose of placing thereon the families which the Baron may direct"; undertakes to pay the expenses of the families, and limits the number to be brought in to five hundred. The conclusion of this decree is fully expressive of the intention of the governor, and demonstrates, if farther proof were indeed necessary, that he had none of giving land to Bastrop. The words are these: " After the lapse of three years, if the major part of the establishment shall not have been made good, the

twelve leagues square destined for those whom the petitioner may place there shall be occupied by the families which first present themselves." Here we have the destination of the twelve leagues square plainly stated, and it is not to be the property of Bastrop.

The next document will be found on the same page, 952. It is in the form of an approval by Carondelet of the location of the twelve leagues square, made by the surveyor-general, Trudeau, and declares that "we," the governor, "do destine and appropriate the aforesaid twelve leagues, in order that the said Baron de Bastrop may establish there, in the manner and under the conditions expressed in the said petition and decree." This was the order given by Carondelet after the survey had been made, and, equally with the decree upon Bastrop's petition, contains no words that can be construed into a grant of land to him. If these instruments, on which alone the plaintiffs' claims rest, so far as the twelve leagues square are concerned, contain no words of grant, nor any words equivalent thereto, how can plaintiffs recover?

By the common law, "Grants, concessions," are "the regular method of transferring the property of incorporeal hereditaments, or such things whereof no livery can be had." "It therefore differs but little from a feoffment, except in its subject-matter; for the operative words therein commonly used are *dedi et concessi*, have given and granted." See 2 Blackstone's Commentaries, 317. So "a feoffment" "is the most ancient method of conveyance, the most solemn and public, and therefore the most easily remembered and proved. And it may be properly defined *a gift* of any corporeal hereditament to another." "The aptest word of *feoffment* is *do* or *dedi*." See 2 Blackstone's Commentaries, p. 310. The common law author here lays down, not only the principle of his own system, but of universal reason; for it is a maxim, applicable to all systems and known in all idioms, that no one is easily to be presumed to give away what belongs to him. *Nemo facile presumitur donare.* Governed by the reason of this maxim, the common law requires expressly, in the concession of corporeal or incorporeal hereditaments, absolute words of gift; and, governed by the same reason, every tribunal, no matter where sitting or under what system, will decide that A has not given any thing to B by written conveyance, unless the instrument uses words of *gift*, or words implying *gift*, and equivalent to it. Measured by this standard, the instrument relied on as a grant of land to Bastrop utterly fails.

It would be quite impossible to find any instrument, which has ever been decided by the courts of the United States to be

a valid grant of lands, that did not contain the express words of grant. To support this position, any case may be looked into which came up to the Supreme Court of the United States from Florida or Missouri, under the laws permitting parties to bring suit to test the validity of their claims to lands in those States. We may cite U. States *v.* Arredondo, 6 Peters, 692; Same *v.* Percheman, 7 Ib. 54; Same *v.* Clark, 8 Ib. 440; Same *v.* Richard, 8 Ib. 471; Same *v.* Hernandez, 8 Ib. 485; Same *v.* Delassus, 9 Ib. 123, 124; Same *v.* Clark, 9 Ib. 168; Same *v.* Burgoin, 13 Ib. 85; Same *v.* Arredondo, 13 Ib. 133; Same *v.* Rodman, 15 Ib. 136; Same *v.* Delespine, 15 Ib. 231.

Every one of these has, in express terms, what the Bastrop claim has not, either expressly or by implication, — direct words of grant.

Under the system of rules and regulations adopted by Spain for the settlement and disposal of the public lands of her colonies, contracts between the government and individuals for the introduction of settlers, of which this contract with Bastrop is one, were well known. They sometimes contained a grant of land to the contractor, and sometimes not; the former was an incident, and not of the essence of the contract, and many were made without it. As an illustration, attention is called to the case of the United States *v.* Arredondo and others, 6 Peters, 692. In this case, Arredondo and son present a petition to the Intendant, Don Alexander Ramirez, offering to form an establishment of two hundred families at a place called Alachua, which they undertook to bring in at their own cost, provided they should obtain, in absolute property, a grant of four leagues of land. Whereupon Almirez issues his decree, in which he uses these words: " I grant to them the part which they solicit of the said tract belonging to the royal domain."

Here is the most striking contrast to, or indeed the very opposite of, the petition and decree in the Bastrop case. Arredondo asks for a grant of land to himself; Bastrop does not. Ramirez *grants* to Arredondo a tract of land. Carondelet uses no such word in relation to Bastrop. Bastrop and Arredondo are both petitioning officers of the same government, acting under the same system of laws; but their petitions are different, and the decrees are different. How, then, can they both be made to mean the same thing?

In looking further into the Bastrop papers (see Laws relating to the Public Lands, p. 953), we find a petition from Bastrop to Carondelet, dated New Orleans, June 12, 1797, fully two years after the original petition praying to be allowed to bring in his settlers, and in this " he begs a grant, along the Bayou Bartholomew from its source to its mouth, of

six toises on each bank, to construct upon them the mills and works he may find necessary," &c. ; and on the same page is found the decree of Carondelet on this second petition, saying: " I grant him, in the name of his Majesty, and by virtue of the authorities which he has conferred upon me, liberty to the Bayou Siar." " I also grant him the exclusive enjoyment of six toises of ground on each side of the Bayou Barthelemi, from its source to its mouth." Now, if there were nothing else, this alone would be conclusive against the construction attempted to be put upon the petition of Bastrop and decree of Carondelet in 1795, by which the plaintiffs claim a grant of twelve leagues square; for on examining the plat of survey of Trudeau of the said twelve leagues square, it will be found that this very Bayou Bartholomew runs right through the middle of it. Hence the fact is clearly demonstrated, that the proceedings in 1795 were not a grant of land, because, if granted to him already in 1795, Bastrop certainly would not pray, in 1797, for a grant of six toises on each side of the Bayou Bartholomew, as the decree in 1795 would already have given him, not only six toises, but many miles deep on both sides of that bayou. Note, too, the mode in which Bastrop asks for these six toises; he thinks it necessary to apologize for making so large a demand. " This request, Sir," says he, " will not be considered exorbitant, when you are pleased to observe that your petitioner, who will expend in these works twenty thousand dollars, will be exposed, without these grants, to lose all the fruits of his labors." How ridiculous to suppose that a man, who had already asked for and obtained one hundred and forty-four square miles, would think it necessary to excuse himself for making a modest and reasonable application for six toises! How still more ridiculous to suppose that a man, who had already obtained a grant of twelve leagues square, would within two years apply for a grant of six toises of the very same land, included in the very same twelve leagues square!

The foregoing considerations would appear to be conclusive against the plaintiffs' claim; but another may be added, of importance not only in this, but in many other suits brought against the United States. If this be, as plaintiffs allege, a grant to Bastrop, was the grant perfect or inchoate at the date of the cession of the country to the United States? If the grant were perfect before that time, then it does not come under the act of 26th May, 1824. Such a grant was protected by the treaty of Paris ; it had no need of an act of Congress to assist it; it has been repeatedly decided by the tribunals of Louisiana, and the principle is recognized by the Supreme

Court of the United States, that a party claiming land by virtue of a Spanish or French grant, perfected before the cession, could maintain successfully his action of ejectment against a possessor under a subsequent title, even if that title were a patent from the United States.  The act of 1824, therefore, was not intended to afford parties an opportunity to sue the United States in cases where those parties could have relief against individuals in possession, but to grant a remedy to those whose rights were not perfected at the date of the treaty, and whose claims were of such a character as, though imperfect, were binding on the conscience of our predecessors; and to those whose claims, even when perfect grants, were derived from the officers of Spain who remained in possession of the country subsequently to the treaty of St. Ildefonso, up to the date of the actual surrender of the province to the authorities of the United States, all such grants, without exception, having been declared null and void, except certain cases of actual settlers, by the stringent provisions of the 14th section of the act of March 26th, 1804, entitled "An Act erecting Louisiana into two Territories, and providing for the temporary government thereof."   2 Statutes at Large, 287.

But if this claim of Bastrop were only an inchoate grant at the time of the cession, then it is incumbent on the plaintiffs to show that it was prevented from being perfected by the transfer of the country to the United States; for the first section of the act of 26th May, 1821 (4 Statutes at Large, 52), provides, among other requisites of the claims whose validity may be tested in the District Courts of the United States, this one, — that they "might have been perfected into a complete title, under and in conformity to the laws, usages, and customs of the government under which the same originated, had not the sovereignty of the country been transferred to the United States"; showing that Congress only intended the United States to be sued (for this is a law which must be construed strictly in favor of the government) in those cases where the transfer of the country prevented the perfection of the plaintiff's title.   Now it is incumbent on the plaintiffs to show that such was the fact.   In the present case, however, it is clear that, as the Spanish officers were in possession of the country during more than eight years after the commencement of Bastrop's proceedings, if he ever had a grant, he could within that time have got it completed, and as he did not, the cause must lie in some other circumstance than the transfer of the sovereignty to the United States; he fails, therefore, in one of the essential features of all suits that can be brought under this act of Congress.

On the part of the appellees there were three elaborate briefs filed, by *Mr. Strawbridge, Mr. Soulé,* and *Mr. Sergeant,* and the case was fully argued orally by the two first-named counsellors. From all these materials, the reporter is perplexed to make a selection to present to the reader. Each of the counsel covered the whole ground in his argument. The two most essential points were, 1st, the power of the Governor-General to make such a grant, and the laws under which it was made; and 2d, what was the nature of the contract or grant. As bearing more particularly upon the first, the views of *Mr. Strawbridge* are presented, and upon the second, those of *Mr. Soulé.*

After examining the various muniments of title *Mr. Strawbridge* proceeded as follows.

Such are the title-deeds proper of the " Bastrop grant." To any person conversant with the ancient Spanish laws, its character and object are unmistakably obvious. Philip Henry Neri de Bastrop was what is termed a *poblador* or colonizer. The word, as defined by Salva, signifies " he who peoples; founder of a colony, — *urbium seu coloniarum conditor.*" His contract was of a kind familiar to the laws of Spain. It was the policy of that country, as it is now the policy of our own, to encourage the population of her vast and magnificent realms, which lay almost valueless until their resources could be developed under the influence of civilization. One of the most ready, as well as least expensive, means of effecting this object was, by granting large tracts of land to the hardy and enterprising adventurers who were willing to follow fortune into the unexplored wilderness of the New World, whether singly or bringing followers in their train. To such, the reward would naturally be proportionate to the services rendered. Every man became an acquisition to the country, and as land cost nothing to the crown, it was liberally bestowed. To men of note, or eminent for their services, a province formed no very generous guerdon. Cortés received a principality; other conquerors, discoverers, and colonizers were rewarded with grants of various extent and value. The solitary emigrant, even without friends or influence, had only to ask in order to receive, on easily performed conditions, such as actual cultivation and occupancy, an ample property in fee simple to him and his heirs for ever. All grants were held by mere allodial tenure, and were almost invariably irrevocable; always so in the absence of any clause to the contrary. They were greater in New than in Old Spain.

" Our ancient legislators," writes Guarinos, Historia de Vin-

culos y Mayorazgos (Entails and Primogeniture), chap. 11, p. 150, "to repeople, cultivate, and defend the lands they conquered, endeavored to establish (*arraigar*) upon them families of all classes, by means of great favors, franchises, and donations. The spaces of lands, allotments, and *caballerias* were not equal in all places, varying greatly, according to the greater or less extent of the territory, the importance of its repeopling, its situation more or less immediate to enemies, and other circumstances. For this reason the *caballerias* (a knight's share or fee) and *peonias* (a foot-soldier's share) were much more liberal generally than in Spain."

The pobladores were specially favored. For their services in introducing emigrants, and settling them in districts allotted to their reception, they not only became entitled on performance of their contracts to such portion of the designated tracts as was not reserved to the use of the subordinate colonists, or, if none had been actually marked out, a concession varying according to the express or implied terms of the contract, and the importance of the colony; but they were also rewarded with numerous marks of honor and distinction. The celebrated body of laws, known as the Recopilacion de las Indias, promulgated about 1680, for the regulation and government of the Hispano-American possessions, and repealing or superseding all contrary enactments, so far as concerned those countries, treats expressly of colonizers, colonists, and colonies. By Tom. II. book 4, title 5, law 11, pobladores, their heirs or children, became vested with full civil and criminal jurisdiction over their respective colonies, with the power of appointing alcaldes and other inferior officers. By various laws of the following title of the same work, they were exempted from imposts and taxation, privileged to wear armor offensive and defensive, recommended to the special care and favor of all governors and viceroys, and to honorable promotion of every kind, and ranked among the nobility of the land. The chapter in question is curious; it contains not a law that does not confer some mark of favor or distinction on discoverers and colonizers, so highly were their services esteemed.

Between those who colonized the country, and those who founded cities, towns, &c., a distinction was drawn, and the rules respecting them and their rights vary, but not materially. Title sixth of the Recopilacion de las Indias, treats, as just observed, of the honors and preferments conferred on both alike; title seventh, chiefly of urban settlements; and title fifth, principally of rural colonies and their colonizers. It is this title which I propose briefly to translate and examine, as from its provisions it will be at once perceived that the rights of the

principal colonizer to the surplus of land in a *poblacion* or settlement, after his colonists had been located, was a legal right, incident to the contract, arising out of the law itself, and wholly independent of and unimpaired by the absence or presence of words of conveyance to him in the instrument of concession.

The first five laws of the fifth title relate merely to the selection of good, healthy, and accessible lands and localities, to the salaries of officers, the employment of Indians, &c., &c.; and, like very many of these laws, are only recommendatory in their provisions. A translation of them, more classic than close, may be found at p. 33 of the Appendix to Vol. II. of the Land Laws, compiled by Matthew St. Clair Clarke in virtue of a resolution of the House of Representatives of March 1st, 1833, and also in Vol. II. p. 44, of the book known as White's Recopilacion. I quote, however, from an original Spanish edition, printed at Madrid in 1756, by authority.

Lib. 4, tit. 5, Law 6 : — " If the fitness of the country should afford opportunity for colonizing some town with Spaniards, with a council of ordinary *alcaldes* and *regidores,* and there should be a person who will undertake a contract to settle it, let the agreement be made, with these requisites : That within the period which may be allotted to him he shall have at least thirty inhabitants, and each one of them a house, ten breeding cows, four oxen, or two oxen and two young bulls, one breeding mare, one breeding sow, twenty breeding ewes of Castile, and six hens and a cock. He shall in like manner nominate a priest, who, may administer the Holy Sacraments, who shall, the first time, be of his own selection, and afterwards according to our royal presentation ; and he shall provide the church with ornaments and articles necessary to divine service. And he shall give security that he will accomplish it within the time aforesaid ; and if he do not complete it, let him forfeit what he may have built, constructed, and cultivated, which we appropriate to our royal patrimony ; and let him, moreover, incur a fine of a thousand dollars of gold for our exchequer. And if he should fulfil his obligation, let there be given to him four leagues of boundary and territory, in a square or oblong, according to the quality of the land, of such form that, if the limits should be marked out, they may make four leagues square ; with this requisite, that the limits of said territory should be distant at least five leagues from any city, town, or village whatever of Spaniards, and that prejudice be done to no village of Indians or to a private individual."

The next law relating to rural colonies is to be construed in connection with the preceding, as appears by the context. It runs thus, including the caption : —

Law 7th. " That there being a contract for a greater or smaller number of inhabitants, it is to be granted with boundaries and territory corresponding, and with the same conditions."

" If there be any one who will obligate himself to make a new settlement in the manner provided, of more or less than thirty inhabitants, providing there be not less than ten, let there be granted *to him* boundaries and territory proportionate, and with the same conditions."

Now, if the introduction of thirty families entitled a poblador to a tract of four leagues square, how many leagues would he be entitled to on introducing 500 ? De Bastrop was evidently restricted by the terms of his contract from claiming all that he might have claimed in the absence of a special allotment by metes and bounds.

The 8th law simply provides that the children and relatives of colonists are also to be considered as settlers, if married.

Law 9th. " That the chief poblador shall contract with each individual who may enrol himself to settle."

" In the contracts for new settlements, which the governor, or the person who may have that power in the Indies, may make with a city, adelantado, alcalde, mayor, or corregidor, the person who may take the contract shall do likewise with each one of the individuals who may enroll themselves to settle, and shall obligate himself to give in the settlement designated lots for building houses, arable and pasture lands, in such quantity of *peonias* and *caballerias* as each one of the settlers may obligate himself to construct, so that he do not exceed or give to each one more than five *peonias*, nor more than three *caballerias*, according to the distinction, difference, and measure expressed in the laws of the title on the distribution of lands, lots, and waters."

Law 10th. " That when there is no private colonizer, but married inhabitants, the settlement is granted to them, provided they be not fewer than ten."

" When some particular individuals shall unite in making a new settlement, and there shall be the requisite number of married men for the purpose, let permission be given them, so that they be not fewer than ten married men ; and let boundaries and territory be given to them, according to what has been already said ; and we grant them power to elect among themselves ordinary alcaldes and annual officers of the council of the settlement."

Analogous to the above are some laws from book 4, title 7, of the Recopilacion, concerning the colonization of cities and towns (not rural colonies, like the present).

Law 7th. " That the tract is divided between him who makes the contract and the settlers, as is ordained."

" The tract and territory that may be given to a colonizer by contract is divided out in the following manner: let there be first taken what may be necessary for lots of the settlement, and suitable commons and pasture-grounds in which the cattle which the inhabitants must have may graze abundantly, and as much more for the corporation lands of the place; the rest of the tract and territory is to be divided into four parts; that part which he may select shall belong to him who is obliged to. make the settlement, and the other three are to be divided out by lot equally to the settlers."

The other laws of this title relate chiefly to the size and arrangement of streets, squares, churches, dwellings, &c., and must be considered, not as imperative and strictly obligatory, but merely recommendatory in their provisions.  Among others, the 25th law confers that power of prorogation of contracts which was necessarily exercised, as a mere matter of justice, by the Baron de Carondelet, in consequence of the arbitrary order contained in his official letter of June 18th, 1797 : —

" If by reason of the occurrence of some fortuitous event, the colonizers should not have completed the settlement within the time specified in the contract, let them not lose what they may have expended or erected, nor let them incur the penalty; and the person governing the country may prolong it as the case may require."

Lastly, I quote from book 4, tit. 12, law 4, of the same Recopilacion, concerning the sale, composition, and distribution of lands, lots, and waters.

Law 4th. " That the viceroys may give lands and lots to those who go to colonize."

" If in the discovered parts of the Indies there should be some sites and districts so good that it may be proper to found settlements, and some persons should apply to make a contract and form a colony on them, in order that with better will and usefulness they may do so, let the viceroys and presidents give them, in our name, lots, lands, and waters, in conformity to the situation of the country, so that it be not to the prejudice of a third person, and be for such time as may be our will." *

---

* The following was cited, also, to show the power of the Spanish governors to make such grants as that to Bastrop, and that no confirmation by the king was necessary.  It was omitted in the translation of the laws annexed to White's Recopilacion and Clarke's Land Laws.

Book 4, tit. 1, law 4, Laws of Indies.  " Of Discoveries."

" We establish and command that no person, of whatever state and condition he may be, shall of his own authority make any discovery by land or sea, nor entry, new settlement, or stock-farm in what has been or is to be discovered in our Indies, without our permission and provision, or that of whoever may have our power to grant it, under penalty of death, and of forfeiture of all his property for our chamber. And we command the viceroys, audiences, governors, and other authorities, not to give permission to make new discoveries without consulting us, and having our

Other laws *in pari materia* exist. By law 24, tit. 3, lib. 4, the chief colonizer is authorized to establish the right of primogeniture and entail to all that may have been granted to him. By law 3, tit. 5, lib. 4, they are authorized to convey to each settler a sub-concession not exceeding five *peonias*, or four *caballerias*. And from the definition of these measures contained in law 1, tit. 2, of the same Recopilacion, as well as from Escricha, Dictionario de la Jurisprudencia, *verb.* "Medida," where he gives the relative proportions of Spanish measures, it is apparent that De Bastrop contracted to narrow down very materially his own sub-concessions below the legal maximum.

Although it might seem, from the closing sentence of the law last recited, that grants to *pobladores* were revocable at will, such, nevertheless, was not the case, unless some clause to that effect had been especially reserved in the deed of concession. By book 3, tit. 5, law 1, of the Novissima Recopilacion de Castilla, and book 3, tit. 12, law 8, of the Fuero Real, which embody the general laws of the realm, it is provided that gifts bestowed by the king cannot be revoked without the fault of the grantee, and pass to his heirs. So by 4th Febrero, part 2, lib. 2, cap. 2, § 3, and No. 115, it is held, that royal donations should be liberally construed; and if such a donation be made to two persons conjointly, and one of them die without heirs, his portion accrues to the surviving donee. In like manner, law 234, page 74, of the Leyes del Estilo, declares, that he who receives a donation from the crown may do with it as he pleases. And Elizondo, in tom. 5, part 2, cap. 6, § 8, writes: " There is no doubt that things which sovereigns bestow upon any person, they cannot afterwards deprive them of, nor prevent them from doing with as they may desire, as well as with their other property; more particularly if the gift be conferred on account of the merit of the person favored, the donation rising then to the force of a contract."

The kings of Spain themselves have repeatedly disclaimed any such power of issuing letters revocatory. " Let such letters, if obtained, so far as regards their abrogation or derogation, or any other thing therein contained, whereby the just and legal rights of a party are taken away, be of no avail, nor have any force or vigor whatever; let such letter be as if it had never been given or obtained."— Montalvo, Ordenanzas Reales de

special license. But wnere the country may have been already discovered and peaceful, we permit them to give leave within their jurisdictions to make the settlements (*poblaciones*) that may be fit, observing the laws of this book, provided that, when the settlement is made, they send us forthwith a report of what they may have executed; and as to the power of viceroys for new discoveries, let the 28th law, tit. 3, lib. 3, be observed in the cases which it comprises."

Castilla, lib. 3, tit. 14, law 7, p. 723; also tit. 12, p. 672, &c., and p. 678, whence I quote.

Of the powers of governors-general to grant lands and to contract for their colonization, I believe there can be no doubt whatever. The very laws referred to not only authorize, but require it. By various other statutes of tom. 2, lib. 3, tit. 3, of the Recopilacion de las Indias, viceroys and governors of the American provinces of Spain are invested with nearly all the authority of royalty itself. No modern procuration could be more plenary than the second law of this title; no ukase or firman more imperative in commanding obedience to them on the part of Spanish subjects. It confers powers without other limit or restriction than may be provided by law; the viceroy may do all that he is not specially and directly prohibited from doing. And we learn from De Mesa, Arte Historica y Legal, lib. 2, No. 91, that the titles of viceroy, captain or commandant general, and governor political and military, are synonymous. The question of their power to grant has been repeatedly settled. See De Armas et al. *v.* The Mayor, 5 La. Rep. 132; Arredondo's case, 6 Peters, 728; Delassus *v.* The United States, 9 Peters, 117; Chouteau's Heirs *v.* The United States, 9 Peters, 147; Pollard's Lessee *v.* Files, 2 Howard, 591; Soulard et al. *v.* The United States, 4 Peters, 591. *A fortiori* they had the power to alienate lands of the royal domain for a valuable consideration.

Such are the Spanish laws under which this grant was made, and by which its intent, meaning, and validity must be tested. They had not merely such force as the common law of England exercised over her colonies, but were enacted expressly for the government of all the American possessions of the Spanish crown. They may strike us as strange or unwise, yet are not the less valid on that account, and certainly must appear less extraordinary to an American court than the forms and provisions of the common law would seem to a Spanish tribunal, when a discussion should arise about an entailed estate, with its fines, contingent remainders, and common recoveries. De Bastrop's grant is assailed and treated as void for the alleged absence of words of conveyance, as if it had originated under the common law. Yet, were such words wholly wanting, which is not the case, the clear and unequivocal laws under which it was really made supply that want, and interpret the meaning and effect of the deeds. They form, so to speak, the *constitution* of the grant; and such as they were impressed upon it at its birth, they must ever continue. But could any Spanish tribunal, uninitiated, ever so far penetrate the antiquated nonsense of a writ of ejectment as to discover

its real object and effect, plain as it may be to·men versed in the common law ? And when, on referring for information to the lawyers of the land, the Spaniard should discover that the object of a common recovery suffered by a tenant in tail was to effect what was most positively prohibited by law (Blackstone expressly says that " they are fictitious proceedings, introduced by a kind of pious fraud to elude the statutes *de donis, de religiosis,* &c."), what would be his astonishment at finding that universally held right and lawful which wore every aspect of illegality, and was in fact illegal ? A Spanish judge would probably nullify a title held by virtue of such proceedings, and would blunder in so doing. Such is a single instance of the difficulties and dangers which beset an examiner into the unfamiliar laws and legal forms of a foreign country. I therefore ask, that, if at the close of this argument any doubt should remain upon the mind of this court, the claimants may have the benefit of that doubt; that the object, meaning, and effect of De Bastrop's grant, as made probable, or rather certain, by the deeds themselves, by corroborating documents, by extrinsic evidence, by the contemporaneous and almost prescriptive interpretation of popular opinion, as well as of history, by the known laws and policy of the Spanish government, and by the opinion of the jury and of the court *a quo,* may have more than ordinary weight; and that forms of concession followed more than half a century ago in a foreign land, by its highest officers, may not be nullified as meaningless and void, because they do not conform to the ideas of men belonging to a later and widely different age, race, government, and generation ; or, if annulled, that it may not be except upon the most clear, palpable, positive evidence of their utter worthlessness and illegality. I invoke, in short, the old, trite, terse law-maxim, *" Omnia rite acta,"* &c.

*Mr. Soulé.*

Point No. 2.— Rights of the claimants under the title which they exhibit.

These will depend, —

1. On what construction is placed upon the terms in which it is executed ; and;

2. If the terms be such as to confer only imperfect rights, upon the concomitant circumstances which may entitle the claimants to have them perfected into complete ones.

Taking the instrument to be unobstructed by any suspensive clause, absolute *ab initio,* or, in other words, unconditional, its bearing and import, it is respectfully submitted, are according to the usages, customs, and laws prevailing in Louisiana at

the date of its execution, so void of ambiguity, and expressed in a language so eminently *sacramental*, as Spanish jurists would say, that they admit of no possible controversy, doubt, or evasion. They are the most proper terms in which the special thing which they were intended to effect could be conveyed; and the slightest attention to their obvious meaning will convince the court of their legitimacy and fitness.

In the original *requête* which he addresses to Governor Carondelet, Baron de Bastrop sets forth, "That it is indispensably necessary, on the part of the government, that there should be designated a district of about twelve leagues square, in which may remain included the Bayou Siard and its vicinity, in order that, without the least obstacle, those families may proceed to settle upon them; which the applicant is going to introduce, under the express condition that concessions of land are to be *gratis*, and that under no title or pretence can they exceed the quantities of 400 arpents at most," &c., and he prays that the government be pleased to fix the number of families which he is to introduce.

The words by which the district is thus to be separated from the king's domain, in this incipient *requête*, are, "*Es absolutamente indispensable que per parte del gobierno se destine*," &c. By referring to one of the most accredited authorities on Spanish philology (Salva's Dictionary), your honors will find that the word *destinar* is the proper one to express the idea which the applicant meant to convey. "DESTINAR: *Determinar alguna cosa por algun fin o efecto*."—" To determine something to some end or purpose." It was usual that, upon such requests (Diligencias), the order of the governor should issue; and this was done either by inserting at the foot of them the formal words, "*Como lo pide, despachase par secretaria en la forma que solicita*"; or by an extended order expressing the assent of the Governor, in the very words of the *requête*, as in the present case for instance, where the order reads: "*Juan Filhiol Señalara doce leguas en quadro, mitad del lado de Bayu Siard, mitad del lado de enfrente del Ouachita, para ir colocando en ellas las familias que el enunciado Baron fue dirigiendo*," &c.—" Don Juan Filhiol will designate twelve leagues square, half on the side of Bayou Siard, and half on the side opposite to the Ouachita, that the families which the aforesaid Baron is conducting may locate there," &c.

And thus, from the words of the contract entered into by the Baron de Bastrop with Governor Carondelet, these twelve leagues, so pointedly designated, were to be assigned, to be constituted — for what? "*Para ir colocando en ellas las familias*," &c.—" That he might locate the families," &c. (Salva's

Dictionary.) They were, therefore, from that moment, separated from the royal domain, and once so separated, could not be resumed, except through the fault of the grantee. Had the claimants under De Bastrop no other title but that, they would still be vested by it with certain rights, inchoate, it is true, yet such as would be recognized by this court, who would feel bound in all justice and equity to perfect them by their decree, unless it were clearly shown that they had been surrendered or forfeited.

If this contract contemplated no actual grant of the lands designated in it, but was merely intended as an adjustment of the relations in which the emigrant families should stand to the government, where is the necessity of marking out twelve leagues square, or something like 1,016,264 arpents? The number of families to be located thither under the contract was fixed at five hundred. They were to have 400 arpents each, or 200,000 arpents in all. What was to become of the remainder? The crown could no longer dispose of it, without a flagrant violation of its faith. The emigrant families could not claim more than what was allotted to them. To whom were to go the remaining 816,264 arpents? To whom I ask it. Here is a difficulty which must be got over before it can be maintained that the grant only transferred from the public domain what each family was to take for itself. The words are clear, their meaning is unmistakable. The twelve leagues square are asked to be set apart, and are constituted for the establishment which De Bastrop was to form on Bayou Siard, and in consideration of his introducing there the five hundred families, to whom he was in his turn to make grants agreeably to the terms of his contract. " *Bien entendido que a ningun se ha de dar mayor concession de tierra que la de quatro cientos arpanes.*" " It being understood that to none shall there be given a greater concession of land than that of 400 arpents." This restrictive clause in the condition imposed upon De Bastrop to grant lands, could only enure to his benefit. It could not affect the king, if the lands not conceded to the individual settlers were to remain public property. Besides, it would only bind him as much and as long as he chose to be bound. And if the domain was to be bound by any such restriction, it was equally bound by the other parts of the contract; and the twelve leagues having once been severed from it, the 816,264 arpents remaining, after awarding to the settlers what had been stipulated in their behalf, would have remained for ever waste property! If De Bastrop had no claim over them, certainly the individual settler had none, and the king least of all, for he had parted with them. He had parted with the twelve integral

leagues for the benefit of De Bastrop's establishment. He could no more violate this than that part of the contract. The contract was absolute as to the quantity of the lands designated and constituted, and conditional in so far only as it was to have no effect unless Bastrop should comply with the obligations which he had assumed in it. And, pray, what was to be the forfeiture in that case? The nullity of the grants which he might have made to individual settlers? By no means. But if Bastrop should not make good within three years the greater part of the establishment, the twelve leagues square destined for the families he was to send were to be occupied by the first families who might present themselves.

Should, therefore, De Bastrop make good his obligations, the twelve leagues were to remain exclusively in his establishment, and to be occupied by himself and the five hundred families which he was to settle there. The argument is conclusive: De Bastrop was certainly comprised in the establishment; he was its head; its ruler; the five hundred families introduced by him thither were not to have more than 400 arpents each, or 200,000 arpents in all. To whom, I ask again, were to revert the remaining lands?

I have said, that, if the contract was not intended to convey a grant of lands to the extent claimed in the *requête*, there could be no necessity for executing another instrument; the first was binding of itself. Indeed, according to the interpretation which is put upon its terms by those who view them in a different light from what I do, it required only at the hands of the government that successive grants should be awarded to the families as they should present themselves under its provisions. The spot where the establishment was to be located could not be mistaken. It was amply described and most pointedly marked out. What surveys were required but such as might be necessary to set apart for every family of emigrants what each was entitled to?

But this assumption cannot bear the least scrutiny. It has no solid basis to stand upon. As well attempt to lay in the air the foundations of a large structure, or to build up a tower on moving sands.

But I proceed.

The contract was in progress, and the contractor rapidly advancing to its completion. Governor Carondelet considers that the time has come for him to give it a more formal shape, and he determines to " designate the twelve leagues destined for said establishment in the terms, with the metes, landmarks, and boundaries, and in the place which is designated, fixed, and marked out by the figurative plan and description affixed

at the head of this title, which are made out by the Surveyor-General, Don Carlos Trudeau, it having appeared to him (Carondelet) most expedient to avoid all contestation and dispute, and approving them," &c., &c.; and he " destines and appropriates the aforesaid twelve leagues, that the said Baron de Bastrop may establish them in the terms, and under the conditions, expressed in the petition and decree of the 20th and 21st of June, 1796."

The twelve leagues had heretofore been but " designated, marked out," *destinadas, senaladas ;* now they are both " designated and appropriated," *destinamos y apropiamos;* says the grant. " APROPIAR : *hacer propia de alguno qualquier cosa*" (Salva's Dict.) ; — " *rem alicui adjudicare*," or " to make something the property of another, to adjudicate a thing to somebody." The court perceives that the property is fully transferred by these terms, and that it has gone out of the domain.

That this paper is a grant, who can doubt that reads with the least attention its contents ? The governor calls it a title, *titulo.* Speaking of the plan and description by Laveau Trudeau, he says : " The plan and description affixed at the head of this title," — " *el plano figurativo y diligencia que van por caveza de este titulo.*" Yes, a *titulo,* which the Spanish jurisconsults call *titulo en forma,* and the French *un titre translatif de propriété ;* — " a title in form ; a title transferring property." And the best evidence that it was so considered is in the fact that the plan affixed to, and made an integral part of, the same, bears on its face, and as its caption, CONCESSION, *grant :* CONCESSION BASTROP, *grant to Bastrop.*

But there are other evidences extant of the meaning and import of that paper, — evidences of high character, too, — of undisputed and indisputable authority.

About ten days before its execution, to wit, on the 10th of June, 1797, Baron de Bastrop complains, " that the twelve leagues which have been granted to him by his contract are found in part overflowed and occupied by ancient inhabitants"; and he prays the governor " to grant him the same quantity of land, &c., &c., without prejudice to the lands which his lordship has granted to the Marquis de Maison-Rouge," &c., &c.

" *Don Felipe de Bastrop tiene la honra de observar a V. S. que las doce leguas en quadro que V. S. le ha otergudo por su contrato se hallan en parte aneyadas y ocupadas por antiguos habitantes ; en cuya virtud, a V. S. suplica se sirva tener á bien concederle la misma cantidad de tierra,*" &c., &c.

This request Carondelet indorses as follows : " *Como lo pide, despachase per secretaria en forma que solicita.*" — " As he requests, let it be despatched in the form which he solicits."

Is that enough? What else is wanted? We have something more. We hold a paper, without a date on its face it is true; without a name at its foot; yet a paper of an unmistakable character, and, may I not say, of some considerable dignity. It is apparently an elaborate essay on the practical workings and results of an operation based on the plan of colonization proposed by De Bastrop. It is proved to be in the handwriting of Francisco Bouligny, who was from 1796 to 1800 Lieutenant-Governor of Louisiana, and for some time within that period acting governor, in the absence of the titulary. It refers in express terms to the Bastrop contract, and therefore must have been written after its execution; and as Bouligny's death occurred some time in 1800, it traces itself, naturally, to an epoch not suspicious (from 1796 to 1800), when these matters were still fresh in the memory of those who spoke of them or wrote about them. It emanates from one high in power, and, in all probability, had its origin in the exigencies of his official duty.

Let us look into it and see what light, if any, it throws on this transaction. After going into a detail of the expenditures to be incurred by the Baron de Bastrop, in order that he might give value to the lands granted to him, and after showing that he could effect it only by introducing at his own cost two thousand families, he comes to the result, " that he will have purchased the 800,000 arpents " remaining, after supplying the five hundred families which he was to settle there under the terms of his contract, "for the value of one million of dollars, which," says he, " corresponds to ten reals of silver the arpent; a price very moderate in comparison with that which these lands will immediately have when the introduction of these two thousand families is once accomplished; and it may be calculated, without exaggeration, at three dollars an arpent, which would leave a profit to Bastrop of 1,400,000 dollars."

Is not this sufficient to establish what meaning it had in the opinion of those whom we must suppose to have been best versed in the usages, customs, and laws prevailing with respect to such matters? I am sure it is; and I might here part with this branch of the case, were it not that I can strengthen it still more by referring to a certain historical document to be found among the papers compiled by Mr. White in his Recopilacion.

Morales (the Intendant of Louisiana), in a long communication to Don Pedro Varela y Ulloa, bearing date New Orleans, October 16, 1797, complains that the royal Hacienda, the public treasury, is overburdened by the contracts which are entered into by private individuals, in order to obtain grants of

lands and lots; and he sets forth "that the royal Hacienda may be spared many expenses and losses which may otherwise result from the combination and execution of projects for obtaining grants of lands and lots; that it is clear that the person who is principally responsible for the royal treasury's interests would be more careful in that which may occasion expenses to the treasury, than one who views the affairs of the Hacienda merely as accessory." 2 White's Recop. 425, 426. And in proof of the abuses he complains of, he adverts to the very case under consideration. "As an instance," says he, " of what I have stated, observe the contract between Baron de Carondelet and Baron de Bastrop for the settlement of five hundred families, in the 144 leagues of plain ground granted by the governor," &c., &c. In fine, he asks that the power of granting lands be transferred from the governor to the Intendant.

His remonstrances were listened to; and on the 22d of October, 1798, the governor was notified "that the king had resolved, &c., that the exclusive faculty of granting lands of every kind should be restored to the Intendancy of the Province, &c.; consequently, the power hitherto residing in the governor to these effects was abolished and suppressed, being transferred to the Intendant for the future." 2 White's Recopilacion, 477.

And thus we cannot lay our hands upon a single public document connected with that epoch, and having reference to those transactions, which does not proclaim the fact that these contracts were considered as actual grants, transferring the lands therein designated to the contractor, appropriating them to him, making them his property.

Nor did the governors, in making such contracts, transcend their authority. We have just seen that, until 1798; it resided fully in them. But was the exercise of that authority a violation of the general laws regulating these matters in the Indies? I am ready to show that it was not.

An ordinance of Philip II., embodied in the Leyes de las Indias, had provided that "*haviendo quien quiera obligarse a hacer nueva poblacion,* &c., *de mas o menos de treinta vecinos, con que no sean menos de diez, se le conceda el termino y territorio,*" &c. Lib. 4, tit. 5, ley 7.

" Should any one contract the obligation of making a settlement of more or less than thirty families, but of no less than ten, let him be granted a district of territory on the same terms and conditions."

And, by referring to the law immediately preceding, it will be perceived that the district of land to be allowed the *poblador*

the undertaker of the settlement, was four leagues square.
" Y, *si cumpliere su obligacion, se le den quatro leguas de termino
y territorio."* Ibid., Ley 6.

Whosoever was to receive the establishment was to give
those who should register themselves as settlers, lots for build-
ing houses, pasture and arable lands, in quantities to suit their
demands, &c., provided the whole he should give did not ex-
ceed five *peonias* or three *caballerias*.

" *El que tomare el assiento, le hara tan bien con cada uno de
los particulares que se registraran para poblar, y se obligara a
dar en el pueblo designado, solares para edificar, tierras de pasto
y labor en tanta quantidad, &c., &c., con que no exceda ni de a
cada uno mas de cinco peonias, ni mas de tres caballerias."* Ibid.,
Ley 9.

And the authority under which such contracts as that of
Bastrop were entered into was derived from the power origi-
nally conferred on the viceroys (afterwards extended to gov-
ernors, intendants, &c.), by an ordinance of Philip II. of
May 18th, 1752, providing: " *Si en, lo yá descubierto de las In-
dias, huviere algunos sitios y comarcas tan buenos que convenga
fundar poblaciones, y algunas personas se applicaren a hacer
assiento, y vecindad en ellas, para que con mas voluntad y
utilidad lo pueden hacer, los virreyes y presidentes les den en
nuestro nombre tierras, solares y aguas,"* &c. Ibid., tit. 12,
ley 3.

" If in those parts of the Indies already discovered, there
should be sites and districts so good that it may be proper to
found settlements, and persons should apply to form a settle-
ment and colony there, in order that they may do so with more
alacrity and usefulness, let the viceroys and presidents give
them, in our name, lots, lands, and waters," &c.

I have, I think, satisfied the court on this point, and now
dismiss it entirely. But should I have failed in carrying your
honors' convictions, I would still plead, in the last resort, that I
have made out a case that claims at their hands all those con-
siderations of equity which the law of 1824 enables them to
allow in cases of an inchoate and incomplete title.

It will not be contested, I am sure, that, as far as the obliga-
tions of De Bastrop went, he faithfully complied with them.
Indeed, so rapidly was he proceeding to their execution, that
he had to be stopped from their further performance by an
order of the governor, issued upon a request of the Intendant,
setting forth that, on account of the scarcity of funds in the
royal treasury, it was necessary that the introduction of
families under De Bastrop's contract should be suspended;
and this order, it will be observed, expressly stipulated " that it

should not prejudice De Bastrop's rights." It extended, to two years after the execution of the contract should have been resumed, the time within which it was originally to be completed in its greater part; and the decree goes on affirming that, " on his part (the governor's), he will religiously comply with the obligations he had contracted, — a maxim which has always distinguished the Spanish nation." — " *Queded vmd. persuadido siempre que por mi parte observare religiosamente los empenos que contracte, maxima que constantamente ha distinguido la nation Española.*"

What can these obligations be.which the governor, with so much emphasis, asserts he will comply with religiously ? The introduction of families being stopped, if De Bastrop's agency was limited to his bringing them into the settlement, what could be those rights which were not to be prejudiced? what those obligations which imposed such duties on the governor as to induce him to pledge the Castilian honor that they would be strictly complied with ? Why, the meaning is obvious; he clearly alludes to the grant which was to close and complete the contract; and we find him, in effect, two days afterwards redeeming his pledge and executing it.

Still, I will admit that this execution of the grant unto Bastrop left him, as to the remaining families which he was to settle there, subject to the requisition of the Spanish government, who might order him to introduce them within the time agreed upon in the decree just cited; and this is the only thing that can be construed as imparting an inchoate and incomplete character to his title. But it is this, also, that brings the grant within the jurisdiction of your honors; not at their mercy, but that they may do with it what the Spanish tribunals might have done and would have done themselves, had not the sovereignty of the province within the limits of which it is located been transferred from Spain to the United States.

" *Si, por haver sobrevenido caso fortuito, los pobladores no huvieren acabado de cumplir la poblacion en el termino contenido en el asiento, no hayan perdido, ni perdan lo que huvieren gastado, ni edificado, ni incurran la pena,*" &c. Leyes de las Indias, lib. 4, tit. 7, ley 25.

" If, by reason of some fortuitous event, the colonizers should not have completed the settlement within the time specified in the contract, let them not lose what they may have expended or erected; nor let them incur the penalty," &c.

Spain might undoubtedly have exonerated De Bastrop from his liability to bring the families agreed upon in his contract. That she would have done so, who can doubt, that reads the remonstrance of Morales above referred to, the order that inter-

vened upon it, and ponders the considerations which prompted the one and the other? Could the government of Spain give up its solemn contract, and repudiate it to the injury of Bastrop, when the latter had so faithfully complied with his obligations under it? Had not De Bastrop at least an equitable claim in that contract, against the government, and will that claim be disregarded merely because the sovereignty has changed hands?

I cannot persuade myself that there is a doubt left in the minds of your honors. But lest they should still hesitate as to the interpretation which I have set upon the terms of the grant, and the opinion I entertain of their legal value and import, I shall take leave to attach to these remarks, and to use as my own, the argument which has been furnished me on that question by the three most eminent jurists now living in Spain, commending it as expressing the views of men familiar with the matters in dispute, and fully able to do them justice, and whose character, profound learning, and ability are avouched, not only by the testimonial appended to their names, but by the universal estimation in which they are held as jurisconsults and doctors of the civil law, and as men of the highest honor, rectitude, and integrity.

*Mr. Soulé* filed as part of his argument the opinion of the Spanish jurisconsults, T. F. Pacheco, Manuel Cortina, and S. de Olozaga, delivered in Madrid, September, 1849.

Mr. Justice CATRON delivered the opinion of the court.

In this case objections were made in the court below, and are again insisted on here, to the proof of authenticity of the title-papers on which the petition is founded; nothing but copies being produced. Our opinion is that the copies were properly admitted in evidence, and that they establish the facts that similar originals existed; and as on the true meaning of these documents our decision proceeds, we deem it proper to set them forth. They are as follows: —

*Copy.*

SENOR GOVERNOR-GENERAL: — The Baron de Bastrop, desirous of promoting the population and agriculture of Ouachita, and being about to pass into the United States of America to conclude the plan of emigration which he has projected, and to return with his family, represents to your lordship that it is indispensable that, on the part of the government, there should be designated a district of about twelve leagues square, in which may remain included the Bayou Siard and its vicinity, in order that, without the least obstacle or impediment, those families may proceed to settle upon them, which the petitioner

is going to introduce under the express condition that con-
cessions of land are to be *gratis;* and that under no title or
pretext can they exceed the quantity of four hundred square
arpents at most, with the object of preventing the introduction
of negroes and manufactories of indigo, which, in that district,
would be absolutely contrary and prejudicial to the culture of
wheat, and would cause the petitioner to lose irremediably the
profits of his establishment.

He also petitions your lordship to be pleased to grant him
permission to export, for the Havana, the flour which may be
manufactured in the mills of Ouachita, without restricting him
to sell it absolutely in New Orleans and posts of this province,
unless it should be necessary for its subsistence, as in that case
it should always have the preference.

It becomes also indispensable that the government should
charge itself with the conducting and support of the families
which the petitioner shall have introduced, from the post of
New Madrid to that of Ouachita, by supplying them with some
provisions for the subsistence of the first months, and facilitat-
ing to them the first sowing of the necessary seed; granting
to the inhabitants who are not Catholics the liberty of con-
science enjoyed by those of Baton Rouge, Natchez, and other
districts of the province, and the government being pleased
finally to fix the number of families which the petitioner is to
introduce.

Zeal for the prosperity and encouragement of the province,
united to the desire of procuring the tranquillity and quiet of
this establishment by removing at once whatever obstacles
might be opposed to these interesting objects, induce me to
represent to your lordship what I have set forth, hoping that
your lordship will recognize in these dispositions the better
service of the king, and advancement of the province confided
to your authority.                            DE BASTROP.

*New Orleans, 20th June,* 1796.

"*New Orleans, June* 21, 1796.

Seeing the advantages which will result from the establish-
ment projected by Baron Bastrop, the commandant of Ouachi-
ta, Don Juan Filhiol will designate twelve leagues square,
half on the side of the Bayou of Siar, and half on the side op-
posite the Ouachita, for the purpose of placing there the fami-
lies which the said Baron may direct, it being understood that
no greater concession of land is to be given to any one than
four hundred square arpents, at most, *gratis,* and free from all
dues.   With regard to the object of this establishment, it is for
the cultivation of wheat alone.   The exportation of the prod-
54*.

ucts of this province being free, the petitioner need not doubt that it will be allowed to him for the flour which he may manufacture at the mills of the Ouachita, to the Havana and other places open to the free commerce of this province. The government will charge itself with the conducting of the families from New Madrid to Ouachita, and will give them such provisions as may appear sufficient for their support during six months, and proportionably for their seeds. They shall not be molested in matters of religion, but the Apostolical Roman Catholic worship shall alone be publicly permitted. The petitioner shall be allowed to bring in as many as five hundred families; provided that, after the lapse of three years, if the major part of the establishment shall not have been made good, the twelve leagues square destined for those whom the petitioner may place there shall be occupied by the families which may first present themselves for that purpose.

THE BARON DE CARONDELET.

Registered. ANDRES LOPEZ ARMESTO.

### *Official.*

Whereas, on the part of the Senor Intendente, by reason of the scarcity of funds, the suspension of further remittance of families has been solicited until the decision of his Majesty, there should be no prejudice occasioned to you by the last paragraph of my decree, which expresses that if, at the end of three years, the greater part of the establishment shall not have been found made good, the families which may present themselves shall be located within the twelve leagues destined for the establishment which you have commenced, and it shall only take effect two years after the course of the contract shall have again commenced, and the determination of his Majesty shall have been made known to you.

" You will always remain persuaded that, on my part, I will religiously observe the engagements which I shall have contracted ; a maxim which has constantly distinguished the Spanish nation. God preserve you many years.

*New-Orleans,* 18*th June,* 1797.

BARON DE CARONDELET.

THE SENOR BARON DE BASTROP.

### *Concession.*

The Baron de Carondelet, Knight of the Religion of St. John, Field-Marshal of the Royal Armies, Governor-General, Vice-Patron of the Provinces of Louisiana, West Florida, Inspector of their Troops, &c.

Whereas the Baron de Bastrop, in consequence of the pe-

tition, under date of the 20th of June of the year last past, and decree of the 21st of the same, has commenced the establishment of Ouachita, which thereby he stipulated with the government, in order to avoid all obstacle, difficulty, and embarrassment hereafter, and that with all facility the families may be located, which, to the number of five hundred, the said Baron is successively and proportionally to introduce or cause to be introduced, we have determined to designate the twelve leagues destined for said establishment in the terms, with limits, land-marks, and boundaries, and in the place which is designated, fixed, and marked out by the figurative plan and description, which go as a caption of this title, which are made out by the Surveyor-General, Don Carlos Trudeau, it having appeared to us to be thus most expedient to avoid all contestation and dispute, and approving them, as we do approve them, exercising the authority which the king has granted us, we destine and appropriate, in his royal name, the aforesaid twelve leagues, in order that the said Baron de Bastrop may establish them in the terms, and under the conditions, which are expressed in the said petition and decree. We give the present, signed with our hand, sealed with the seal of our arms, and countersigned by the undersigned, honorary commissary of war, and secretary for his Majesty of this commandancy-general of New Orleans, on the 20th of June, 1797.

THE BARON DE CARONDELET.

ANDRES LOPEZ DE ARMESTO.

*[For map see original.]*

I, Don Carlos Trudeau, Surveyor Royal and Particular of the Province of Louisiana, &c., do certify that the present draft contains one hundred and forty-four superficial leagues, each league forming a square, the sides of which are in length two thousand and five hundred toises [a toise is six French feet long], measure of the city of Paris, according to the custom and practice of this colony, the said land being situated in the post of Ouachita, about eighty leagues above the mouth of that river, falling into Red River, adjoining on the part of the southwest to the eastern shore of the river and bayous Ouachita, Barthelemi, and Siard, conformably to the red line which borders the said river and bayous, bounded on the south part by a line drawn from the south seventy-five degrees east, about three leagues and one mile long, beginning from the shore C of the Bayou Siard, and continuing as far as the height of the junction A of the said Bayou Siard with the Bayou Barthelemi; the said point A being as a basis on the line of measurement A B, of twelve leagues in length, parallel with the plan

of Bayou Barthelemi from the point A to the end of the said twelve leagues, which terminate at the point B, where is the mouth of the rivulet named Bayou Termiro; the lines D E, F G, are parallel lines, directed north fifty-two degrees east, without minding the variation of the compass, which varies eight degrees to the northeast.

In testimony I deliver the present certificate, with the draft hereto affixed, for the use of the Baron de Bastrop, on the 14th day of June, 1797, I, the surveyor, having signed the same, and recorded in the book A, No. 1, folio 38, draft No. 922, of the surveys.

I do certify the present copies to be conformable to the originals which are lodged in the office under my care, to which I refer; and, at the request of a party, I deliver the present, same date as above.

CARLOS TRUDEAU, *Surveyor.*

To THE GOVERNOR-GENERAL : — Baron de Bastrop has the honor to make known to you that, it being his intention to establish in the Ouachita, it is expedient that you should grant to him a corresponding permission to erect there one or more mills, as the population may require; as also to shut up the Bayou de Siar, where he proposes to establish the said mills, with a dike in the place most convenient for his works; and, as it appears necessary to prevent disputes in the progress of the affair, he begs also the grant along the Bayou Barthelemi, from its source to its mouth, of six toises on each bank, to construct upon them the mills and works which he may find necessary, and prohibiting every person from making upon said bayou any bridge, in order that its navigation may never be interrupted, as it ought at all times to remain free and unobstructed. This request, Sir, will not appear exorbitant, when you are pleased to observe that your petitioner, who will expend in these works twenty thousand dollars or more, will be exposed without these grants to lose all the fruits of his labors by the caprice or jealousy of any individual, who, being established on this bayou, may cut off the water or obstruct the navigation; not to mention the loss which the province will sustain of the immense advantages to result from the useful project proposed for the encouragement of the agriculture and population of those parts. DE BASTROP.

*New Orleans, June 12, 1797.*

*New Orleans, June 12, 1797.*

Considering the advantages to the population on the Ouachita, and the province in general, to result from the encour-

agement of the cultivation of wheat, and the construction of flour-mills, which the petitioner proposes to make at his own expense, I grant him, in the name of his Majesty, and by virtue of the authorities which he has conferred upon me, liberty to shut the Bayou de Siar, on which he is about to establish his mills, with a dike at the place most proper for the carrying on of his works. I also grant him the exclusive enjoyment of six toises of ground on each side of the Bayou Barthelemi, from its source to its mouth, to enable him to construct the works and dams necessary for his mills; it being understood that by this grant it is not intended to prohibit the free navigation of the said bayou to the rest of the inhabitants, who shall be free to use the same, without, however, being permitted to throw across it any bridge, or to obstruct the navigation, which shall at all times remain free and open. Under the conditions here expressed, such mills as he may think proper to erect may be disposed of by the petitioner, together with the lands adjoining, as estates belonging entirely to him, in virtue of this decree, in relation to which the surveys are to be continued, and the commandant, Don Juan Filhiol, will verify and remit them to me, so that the person interested may obtain a corresponding title in form; it being a formal and express condition of this grant, that at least one mill shall be constructed within two years, otherwise it is to remain null.

THE BARON DE CARONDELET.

Registered.     ANDRES LOPEZ ARMESTO.

To his Excellency the Senor Baron de Carondelet, Governor-General of the Province of Louisiana, &c.

Don Philip de Bastrop has the honor to observe to your lordship, that the twelve leagues square which your lordship has granted to him by his contract are found in part over-flowed and occupied by ancient inhabitants, in consequence of which he prays that your lordship will be pleased to grant him the same quantity of land, to be taken upon the River Ouachita and the Bayous de Siard and Barthelemi, where it will be most convenient to him, without prejudice to the lands which your lordship has granted to the Senor de Maison-Rouge, in the Prairie Chatellerian; a favor which he hopes to receive from the upright justice which your lordship administers.

P. DE BASTROP.

*New Orleans, 10th June, 1797.*

### Order.

*New Orleans, 10th June,* 1797. As he requests, let it be despatched by the secretary department, in the form which e solicits.     THE BARON DE CARONDELET.

The United States *v.* Philadelphia and New Orleans.

## *Translation.*

June 21, 1796.

To THE SENOR BARON DE BASTROP:— With attention to the advantages which must result to the population of the Ouachita, and that of the province in general, from the encouragement of the cultivation of wheat and construction of flour-mills which the petitioner intends to make at his expense, I grant him, in the name of his Majesty, and using the powers which he has conceded to me, that he may close the Bayou de Siar, where he may establish the mills with a dike at the place most suited to his works. I likewise grant him the exclusive enjoyment of six toises of land on each side of the Bayou Siar, from its source to its mouth, in order that he may construct the works and embankments necessary to his mills; it being well understood that in this grant it is not understood to prohibit the free navigation of said bayou to the other inhabitants who may make use of it; without, nevertheless, it being permitted to them to cast any bridge nor embarrass the navigation, which at all times is to remain free and unimpeded. Under the conditions expressed, when the mills have been constructed which he may see fit, he may dispose of them and of his adjacent lands as property belonging to him entirely, in virtue of this decree, by which the proceedings of survey, which the commandant, Don Juan Filhiol, shall make out and remit, shall be extended in consequence, in order to provide the party concerned with the corresponding title in form. It being a formal and express condition of this grant, that at least one mill be found constructed within two years, since otherwise it shall remain annulled.

The Baron de Bastrop contracts with his Majesty to furnish, for the term of six months, rations to the families which he has latterly introduced at the post of the Ouachita, which are to be composed of twenty-four ounces of fresh bread, or an equivalent in flour; twelve ounces of fresh beef, or six of bacon; two ounces of fine *manestra*, or three of ordinary, and one thousandth part of a *celemin* (about a peck) of salt; for which there is to be paid to him, by the royal chests, at the rate of a real and a half for each ration; for which purpose there shall be made out, monthly, a particular account, the truth and regularity of which shall be attested, at foot, by the commandant of that post. Under which conditions, I oblige myself, with my person and estate, to the fulfilment of the present contract, subjecting myself, in all things, to the jurisdiction of this General Intendancy.

In testimony of which, I sign it at New Orleans, the 16th of June, 1797. BARON DE BASTROP.

*New Orleans, date as above.*

I approve this contract, in the name of his Majesty, with the intervention of Senor Gilbert Leonard, principal contractor of the army in these provinces, for its validity. Two certified copies are to be directed to the Secretary, Juan Ventura Morales. With my intervention, Gilbert Leonard. Copy of the original, which remains in my keeping, and which I certify, and is taken out, to be passed to the Secretary of this General Intendancy.

*New Orleans, ut supra.*

GILBERT LEONARD.

Whereas the Intendant, from the want of funds, has solicited the suspension of the last remittance of families, until the decision of his Majesty, there ought to be no prejudice occasioned to you by the last paragraph of my decree, which expresses that, if within three years the major part of the establishment shall not have been made good, such families as may first present themselves shall be located within the twelve leagues destined for the settlement which you have commenced; and this shall only have effect two years after the course of the contract shall have again commenced to be executed, and the determination of his Majesty shall have been made known to you. You will always remain persuaded that, on my part, I will observe, religiously, the engagements I have contracted; a principle which has constantly distinguished the Spanish nation. God preserve you many years.

*New Orleans, June* 18, 1797.

THE BARON DE CARONDELET.

BARON DE BASTROP.

Complainants exhibit all these title-papers, and pray that the validity of their claim may be inquired into and decided. On part of the United States, a brief denial of all the facts alleged was made; and on this issue the District Court adjudged that the grant to the Baron de Bastrop was a valid and lawful grant, by legal title in form; and further adjudged that complainants be declared the true and lawful owners, and entitled to recover from the United States, and be for ever quieted and confirmed as against the United States in the ownership and possession of the land claimed by them.

And here a difficulty arises, whether the District Court had jurisdiction, as on its own assumption, that this was a perfect Spanish grant, no power existed under the act of 1824 to pass judgment on such title. So we held at our last term, in the case of the United States *v.* Reynes, 9 Howard, 127.

But in all cases of titles not perfect, and which by decree may be made so, founded on the equity of such claim, jurisdiction does exist; and Bastrop's contract with the Spanish government, not being a perfect title in our judgment, either in form or substance, its character and validity can be inquired into, and adjudged, under the act of Congress. And that it was of this imperfect character, complainants themselves formerly assumed; they having submitted their title to a board of commissioners instituted to examine and report to Congress on imperfect grants, and which board reported unfavorably of the Bastrop claim.

It has also on several occasions been presented to Congress, and a perfect title required, on the assumption that there was none.

It is true, that no equity is set up in the petition, the title-papers being relied on, and nothing more; nor is there any evidence found in the record, tending to prove that Baron Bastrop expended any thing whatever by bringing in families. They were obviously settled on the land at government expense. Only between twenty and thirty families were settled, as is proved by Stuart and Filhiol, who name the heads of each family, and who are complainants' witnesses. The settlers have received titles from the Spanish provincial government, or from the United States government, under which they now stand protected. They manifestly never claimed under Bastrop, nor sought to acquire titles under him. This disposes of the preliminary questions.

And we now come to an examination of the title set forth and relied on in the petition. The final power concluding Governor Carondelet's decrees bears date June 20, 1797. For a proper understanding of this decree it must be taken in connection with previous documents to which it refers, including the proces verbal and plan, delivered to Baron Bastrop, June 14, 1797, by Trudeau, the Surveyor-General. June 20, 1796, Bastrop represented to the governor, that, to conclude his plan of emigration to Ouachita, which he had projected, there should be designated a district of about twelve leagues square, in order that, without the least obstacle or impediment, the families he might introduce could proceed to settle on the land.

June 21, 1796, the governor assented to this request, and ordered Filhiol, the commandant at Ouachita, to designate the land; "for the purpose of proceeding to locate upon them the families which the aforesaid Baron may direct."

The land was designated by a plan; and on it, and on the previous agreement, the final decree of June 20, 1797, proceeds. It is insisted that this is a decree of a perfect title, (or

fee simple in our law language,) vesting the twelve leagues square in absolute property in the Baron de Bastrop, subject to descent and alienation; and as a settlement of this question will end the controversy, we do not propose to examine any other. This document recites, that the Baron had commenced the establishment, according to his petition and the governor's decree therein, of the previous year; and in order to avoid all obstacles, difficulty, and embarrassment thereafter, and that with all facility the families might be located to the number of five hundred, as the Baron was bound to do; "we have," says the governor, "determined to designate the twelve leagues destined for said establishment." That is to say, according to the plan of survey above referred to, and which is attached to the decree. And then came the effective words of grant relied on: "We destine and appropriate in his royal name [the king's] the aforesaid twelve leagues, in order that the said Baron de Bastrop may 'establish' them, in the terms, and under the conditions, which are expressed in the said petition and decree." Having had a translation made of the Spanish grant, we find that the word "establish," next above, should be "settle."

A territory of twelve leagues on all sides, amounting to one million of arpents, was "destined and appropriated," in order that the Baron "might settle the land," and establish his colony, without difficulty or embarrassment in exclusion of others making similar establishments under public authority; and also in exclusion of private persons, not introduced by the Baron. For this purpose, the land was destined and appropriated. As colonizer, the Baron had a monopoly, within the district, to introduce settlers. His object was monopoly throughout. He was a Hollander, and proposed to introduce farmers from his own country, as appears by Governor Carondelet's letter to Filhiol, commandant at Ouachita, read by complainants. To each emigrant family a tract of four hundred arpents was to be granted *gratis;* the farmers were to be engaged in raising wheat, and restricted to this crop as an article produced for the market. To prevent other crops, such as indigo, from being grown, the farms were to be small; and in aid of this policy, slave labor was intended to be excluded.

As five hundred wheat-growing farms were to be established under the supervision of the Baron, it is manifest that a large section of country was deemed necessary, because the greater portion of southern flat and wet lands were unfit for the purpose of raising wheat.

Another circumstance is manifest. The agitations of his own country, growing out of the French revolutionary wars,.

were such as to induce the Baron to believe, no doubt, that families might be had, to almost any number, whose farms had been devastated at home by the events of war, or who desired to seek shelter from harassment in Louisiana. And in this conclusion the Spanish government obviously concurred; and was furthermore of opinion, that great advantage would result to the province from such an establishment as was proposed by the Baron; and therefore he was most liberally dealt by. From New Madrid, on the River Mississippi, through the country, to the lands designated, the government bound itself to transport the emigrant families and their baggage, to the number of five hundred; to furnish them with support for six months, and with seed for the first year.

Thus, provision was made for a colony at public expense. The Baron's design was the production of large quantities of wheat. This was a primary step contemplated. But the leading object of profit, on part of the Baron, was the manufacture of flour; and that he should be the exclusive monopolist in grinding the wheat. To secure this monopoly, he applied to the governor for a grant in property of the Bayou de Siar, and also the Bayou Barthelemi, and six toises of land on each side of said bayous, from their sources to their mouths, for the purpose of enabling him to erect his mills on them, and of making the necessary dams and dikes: in doing which he alleged that he would have to expend twenty thousand dollars, or more. The grant was made, as solicited, for both the bayous. It declares that "such mills as he (the Baron) may think proper to erect, may be disposed of by him, together with the lands adjoining, as estates belonging entirely to him." And the commandant, Filhiol, was ordered to survey the bayous and lands granted on each side thereof, and remit the surveys to the governor, so that the Baron might obtain a corresponding title in form. The Bayou de Siar bounds one side of the survey of twelve leagues, and the Bayou Barthelemi meanders through its depth, for twenty or thirty miles.

The Baron also stipulated by his contract that he might be permitted to transport his flour to Havana, and other places open to the free commerce of the province, without hinderance or charge.

Taken in all parts, such was this contract and its objects. And as the motives of the parties enter decidedly into its construction, we have stated them in advance. The manifest design of the Baron was to become a large manufacturer of flour; to control the inhabitants and monopolize the wheat, throughout the territory designated for the colony. He did not propose to cultivate the soil himself, nor did he require

land for this purpose; his grant in full property of the water-power necessary for grinding was all the property he required. Over other lands within the twelve leagues he sought control, but asked for no title to property in them. His first request to the Spanish government was in plain accordance with these views of the transaction; he solicited "that a district be designated about twelve leagues square, in which he may place the families he is about to bring in": and the request was granted, in the terms and for the purposes expressed by the petition. To hold that the language employed by the petition, and reiterated by the governor in reply, amounted to a title in property, would be a forced and unnatural construction, contrary to the objects proposed to be accomplished, and in violation of the known policy of the Spanish government; which was, to encourage population and agriculture, but to discourage speculation, by refusing to grant large districts of arable lands to single individuals.

If the decree of June 20, 1797, was intended to confer a title in full property, and the terms "destine and appropriate" meant to convey the same title, that was plainly given to the two bayous, what occasion could exist for such a careful proceeding to obtain these bayous in full property? The Bayou Barthelemi lies within the grant, and the assumption is extravagant that it was twice granted; once June 12, and again June 20, 1797.

Another consideration shows the manifest inconsistency of assuming that both grants were in full property. The grant of the bayous was on the express condition that at least one mill should be constructed within two years from that date, otherwise the grant should remain null. How could it stand annulled on failure to perform a subsequent condition, if the larger grant was also in full property, and included the bayous? In such case, the forfeiture would not result to the crown, but to Bastrop himself; being saved by the larger grant, including the bayous. And then, the twelve league grant having no condition in it, that of the bayous amounted to nothing, was idle, and useless.

In the next place, if the Baron had a perfect grant, the families brought in could only take titles from him as owner; the government having nothing left to grant. And yet these immigrant settlers applied to the Spanish government for titles, which were granted, and that at a time when the meaning of the contract could hardly be misunderstood; being only a couple of years after it was concluded.

An instance is found in the record, and was given in evidence below. April 1, 1799, Michael Rogers, a settler placed

on the land by Bastrop, applied for a title, and during that year a perfect title was decreed by the Intendant Morales, according to the petition of Rogers.

Again, if the Baron could not by a conveyance make title to settlers, on what plausible pretence can it be assumed that he could convey in full property the whole twelve leagues to Morehouse and others?

Furthermore, if. Morehouse took the full legal title by his deed, on what ground can it be assumed that our government could defeat such fee-simple title in Morehouse, and his alienees, by making grants in fee to individual settlers, either coming in under Baron Bastrop or otherwise? And yet this has been uniformly done. For forty years and more, the claimants under this grant have stood by, announcing that they were fee-simple owners, and in possession of a perfect legal title, without an attempt to try the strength of their claim by suit. The manifest truth is, that the validity of this claim has been disavowed by the Spanish and American governments, and that the claimants had no confidence in it themselves; certainly not enough to risk a trial of it in a court of justice, as they might at all times have done, by petitory actions against obtruders. These references, however, to particular transactions and facts, whether found within or outside of the title-papers, are of little consequence, compared with the prominent and conclusive consideration, that a complete Spanish grant uniformly (so far as our knowledge extends), plainly, and in language the most direct and unequivocal, gave to the grantee the whole ownership to the land granted, for him and his successors; with power to sell the same at his will. An instance of such grant is given in 8 Howard, 314, attached to the case of Menard's Heirs v. Massey.

We repeat, that no language is employed in any part of the contract with the Baron de Bastrop, importing a grant in property. No expression is used by the Spanish governor conveying such intention. It is plainly a contract that a large district should be designated on lands belonging to the public domain, where the Baron might exercise certain exclusive privileges. In its nature and extent of grant this contract is identical with that made on the same day (June 20, 1797) with the Marquis de Maison-Rouge, appropriating a district of country adjoining to that set apart for the Baron de Bastrop, on which the Marquis agreed to establish settlers, and which lands were claimed under his will, on an assumption that the grant was complete and conferred absolute ownership. The principles governing the two contracts are the same. The claim set up under the Marquis de Maison-Rouge was adjudged not to have given

any title, in the case of United States *v.* King, first reported in 3 Howard, 773; but which was finally decided in 1849, and stands reported in 7 Howard, 833. We deem the principles there adjudged as governing the case before us; and to the opinion of the court then delivered by the chief justice, and found in 7 Howard's Reports, we refer for a more full discussion on this description of claim. Nor would we again have considered the question involved, had there not been various circumstances connected with the cause now before us, and expressions used in the agreement made by the Spanish authorities with the Baron de Bastrop, that are supposed to be of a character to distinguish the cases; and were urged in argument as having done so; but which are found on examination to be immaterial.

On the whole, we are of opinion that the decree of the District Court should be reversed, and the petition dismissed; and so order.

The causes of United States against Louise Livingston and others, and United States against Thomas Callender's widow and heirs and others, claiming under Bastrop, are identical with the cause above decided; and for the reasons here assigned, it is ordered that both the decrees in these causes be reversed, and that the petitions be dismissed.

Mr. Justice McLEAN, Mr. Justice WAYNE, Mr. Justice McKINLEY, and Mr. Justice GRIER dissented.

Mr. Justice McLEAN.

I had hoped that the attitude in which this case was presented would have led to a different result from that which has just been pronounced. It appeared to me that there were grounds for such an expectation. The case is in chancery. It presents the broad basis of equity, and in this view, I supposed, could not be considered as having been ruled by the decision in the case of the United States *v.* King. That was a petitory action under the Louisiana practice, in the nature of an action of ejectment. In their opinion the court say: "If these defendants had possessed an equitable title against the United States, as contradistinguished from a legal one, it would have been no defence to this action. But no such title is set up, nor any evidence of it offered. The defendants claim under what they insist is a legal title, derived by the Marquis de Maison-Rouge from the Spanish authorities." And in the conclusion of their opinion, the court say: "For the reasons herein before stated, that this instrument of writing relied on by the defendants did not convey, or intend to convey, the land in question to the

55 *

Marquis de Maison-Rouge, the judgment of the Circuit Court must be reversed, and the cause remanded," &c.

Now if the instrument did not convey the land by a complete title to the Marquis, it by no means necessarily followed that, under the usages of the Spanish government, an equity was not transferred by it. It is admitted that all instruments of writing, whether purporting to be grants or contracts, must be construed by the court. But if the instrument has been executed under foreign laws, and especially if it relate to the realty, parol evidence is heard both in regard to its form and effect. This principle is as old as the law itself; and it arises from that natural sense of justice which pervades all systems of jurisprudence. And if on such an investigation it should appear, that an interest less than a complete title was conveyed, the interest would be protected under the treaty of 1803, and the acts of Congress.

By the act of the 26th of May, 1824, made applicable to this case by the act of the 17th of June, 1844, claims are provided for " which might have been perfected into a complete title, under and in conformity to the laws, usages, and customs of the government under which the same originated, had not the sovereignty of the country been transferred to the United States." And the proceeding in the court is to " be conducted according to the rules of a court of equity." And the decree in regard to the title is to be " according to the law of nations, the stipulations of any treaty, and proceedings under the same, the several acts of Congress in relation thereto, and the laws and ordinances of the government from which it is alleged to have been derived." The treaty of cession stipulated that the property of the citizens should be protected. And if the claim now before us, under the Spanish law, could be denominated property, this court have jurisdiction, and the right should be maintained. On a mature examination of this whole case, I am brought to the conclusion that, under the Spanish government, the right now asserted would have been enjoyed by the Baron de Bastrop, his heirs and assignees.

He brought over from Europe, and settled on this grant, at least one hundred and eleven families, at an expense, probably, of from thirty to fifty thousand dollars. His labors and responsibilities were very great in carrying out his engagement with the government, and he would have completed it, without doubt, had not the importation of families been suspended, at the instance of the government, on account of the scarcity of funds. The enterprise was deemed of the highest importance by the Governor-General. In a letter to Filhiol, the commandant at Ouachita, dated New Orleans, 2d April, 1795,

Carondelet says: " Your hopes are about to be satisfied."
" We have just passed a contract with the Marquis of Maison-Rouge for thirty families of agriculturists," &c. " On the other hand, the Baron de Bastrop, a Hollander, has contracted also for a quantity of families who will come to us direct from Holland," &c. And he remarks: " According to this plan you see, Sir, that you will no longer be so isolated as heretofore, and that in a short time you will find yourself in a condition to make head against the savages," &c.

How favorably would such a consideration contrast with those on which immense tracts of land were granted, by the Spanish government, in East and West Florida, and which have been confirmed by this court. The construction of a saw-mill, the formation of a cow-pen, or other service, real or supposed, rendered to the public, was deemed sufficient to authorize a large grant of territory. This was the policy of that government, and, under the faith of the treaty and the acts of Congress referred to, it was sanctioned by this court.

For more than fifty years have the families brought from Europe by the Baron de Bastrop been in possession of this land. They occupied and improved it as their own, and, in the course of nature, their children and descendants may now be supposed to possess it. The right of each family was limited in the grant to four hundred arpents. This claim, being located and designated by boundaries, entitled each family to a particular tract, and some evidence of title was necessary, whether from the Baron de Bastrop, or, by his designation and consent, from the governor, would seem to be unimportant. In fact, it could have been only a mere allotment among the families in pursuance of the grant. Of this character was the allotment to Michael Rogers; it was a recognition of the grant to Bastrop.

The correctness of this statement is shown from a letter of Filhiol, dated 12th September, 1796, to the Marquis de Maison-Rouge, which says, referring to a letter from the Governor-General:— " His Excellency adds: I charge you also, Sir, in the absence of M. de Grand Pre, to oblige M. de Maison-Rouge to make choice of the four thousand arpents of land which are to be distributed to the thirty families which he is to establish."

It appears from the evidence, that about twenty-one thousand dollars have been paid in taxes upon about three sevenths of this grant, and it is supposed that a larger sum has been paid on the other four sevenths.

What was the nature of the title given to the Baron de Bastrop?

In his petition to the Governor-General, dated the 20th of

June, 1795, he asks that there should be designated a district of about twelve leagues square," &c., " in order that, without the least obstacle or impediment, those families may proceed to settle upon them which he is going to introduce under the express condition that concessions of land are to be *gratis;* and that under no title or pretext can they exceed the quantity of four hundred arpents at most."

The decree of the governor the following day was : " Considering the advantages which must result from the establishment," &c., " the commandant of Ouachita, Don Juan Filhiol, will designate twelve leagues square, half on the side of the Bayou de Siar, and half on the side opposite Ouachita, for the purpose of proceeding to locate upon them the families which the aforesaid Baron may direct ; it being well understood that to none shall there be given a greater concession of land than that of four hundred square arpents at most, *gratis* and free from all dues, inasmuch as the object of this establishment is to be only for the cultivation of wheat," &c. And the government is asked " to fix the number of families which the petitioner is to introduce." In the decree which followed, it is said : " The petitioner may introduce to the number of five hundred families." And the government undertook to pay the expense of conveying the families from New Madrid to Ouachita, and furnish them with provisions for six months, " Provided that, if, after the lapse of three years, the greater part of the establishment shall not have been made good, the twelve leagues square destined for the families which the Senor petitioner will send shall be occupied by the first families that may present themselves."

The expenses to the government under this decree being greater than its limited means would warrant, the Baron de Carondelet, on the 19th of June, 1797, gave an official paper to the Baron de Bastrop, stating, " whereas, on the part of the Senor Intendente, by reason of the scarcity of funds, the suspension of further remittance of families has been solicited until the decision of his Majesty, there should be no prejudice to you by the last paragraph of my decree, which expresses that, if, at the end of three years, the greater part of the establishment shall not have been found made good, the families which may present themselves shall be located within the twelve leagues destined for the establishment which you have commenced, and it shall only take effect two years after the course of the contract shall have again commenced, and the determination of his Majesty shall have been made known to you."

And on the 20th of June, in the same year, the Baron de Carondelet issued a concession, stating, " Whereas the Baron

de Bastrop, in consequence of the petition, under date of the 20th of June of the year last past, and decree of the 21st of the same, has commenced the establishment of the Ouachita, which thereby he stipulated with the government, in order to avoid all obstacle, difficulty, and embarrassment hereafter, and that with all facility the families may be located, which, to the number of five hundred, the said Baron is successively and proportionally to introduce, or cause to be introduced, we have determined to designate the twelve leagues destined for said establishment in the terms, with limits, landmarks, and boundaries, and in the place which is designated, fixed, and marked out by the figurative plan and description, which go as a caption of this title, which are made out by the Surveyor-General, Don Carlos Trudeau, it having appeared to us to be thus most expedient to avoid all contestation and dispute, and approving them, as we do approve them, exercising the authority which the king has granted us, we destine and appropriate, in his royal name, the aforesaid twelve leagues, in order that the said Baron de Bastrop may establish them in the terms, and under the conditions, which are expressed in the said petition and decree." The boundaries of this grant are made certain by its calls, the figurative plan of Don Carlos Trudeau, the Surveyor-General, and an actual survey executed by McLaughlan.

Does this grant convey any title to the Baron de Bastrop, and if it does, to what extent?

The consideration which induced the grant was, the establishment of five hundred families within its limits. As each family was restricted to four hundred arpents, the five hundred would occupy only two hundred thousand acres, leaving eight hundred thousand within the grant unappropriated. In the first grant, if the greater part of the establishment should not be made good within three years, the first families that shall present themselves were to be received, as a part of the five hundred which were to be introduced by Bastrop. And as the pecuniary aid of the government was withheld, the above condition was suspended until the lapse of two years after the will of the sovereign should be made known.

Governor Bouligny, a contemporary, speaking of this grant, says: " Let us make the calculation upon a million of arpents, in round numbers. Bastrop has obliged himself to introduce and locate in this tract five hundred families of cultivators, giving them to each family a piece of land ten arpents front upon the Ouachita or Bayou Siar by forty arpents depth, which will make a superficies of four hundred arpents for each family, so that the five hundred families will occupy a surface of two

hundred thousand arpents. So that there will be to him, in absolute property and lordship, eight hundred thousand arpents."

To suppose that the Baron de Bastrop would engage in such an enterprise, involving an immense expenditure of money, in addition to the great labor and responsibility of superintending the importation from Europe of five hundred families, would be unreasonable, and against the established usages of the government. The service was one of the greatest importance to the country, and it was favored by the sovereignty itself.

This is shown by the express sanction by the king of the contract made by the Baron de Carondelet with the Marquis de Maison-Rouge, to bring into the country thirty families, dated 17th March, 1795; and as a consequence of which there were subsequently granted thirty superficial leagues. The transaction with the Baron de Bastrop occurred about the same time.

It is true, that Morales, being Intendant *ad interim*, and being under obligations to provide means to meet the expenditures arising out of these and similar grants, remonstrated to the king against the policy of making them. He says, in a letter to Don Pedro Varela y Ulloa, dated October 15th, 1797: " As an instance of what I here state, observe the contract between Baron de Carondelet and Baron de Bastrop, for the settlement of fifteen hundred Protestant families, in the one hundred and forty four square leagues of plain ground, in the district of Ouachita granted by the governor, on condition that the royal Hacienda should pay the expense of transporting those persons from New Madrid to their place of settlement, of maintaining them for the first six months," &c.; and he says it would cost the treasury $ 125,000, and suggests : " It is not probable that, if the Baron de Carondelet had held the obligations of the intendency, he would have rendered it liable for a demand which there was no means to satisfy." In consequence of this remonstrance, by a royal order, dated 22d October, 1798, the right to grant lands was transferred from the Governor-General to the Intendant.

It must be observed, if there be no error in the translation, that Morales was mistaken in stating the number of families, and that they were to be Protestants. In a letter dated the 25th of July, 1799, he particularly complains of the prodigality of Don Manuel Gayoso de Lemos in allotting large quantities of land to persons who could not even cultivate them," &c. But, he says, " to annul these grants would be productive of great difficulties, and this must be considered an evil without a remedy."

There is nothing in this change of policy, which was induced from a want of funds, to affect the rights acquired under the more liberal policy which preceded it.

But, it is said, the grant must be construed by its language, and not by extraneous facts and circumstances. This is correct as a general principle, but when we are called to construe an instrument, unknown to the laws with which we are familiar, and which was formed in a foreign idiom, and in accordance with usages and laws to which we are, in a great degree, strangers, it is wise and it is legal to follow the established construction of such an instrument under such laws.

That the grant in this case separates the land designated from the public domain, is clear to my mind; and if separated, has it not passed from the control of the sovereignty? Beyond the settlement of the five hundred families, the government had no demand on the grantee. This settlement being made, the condition of his grant is performed. And if the government failed, as was the fact, to advance the funds stipulated to be paid by it, and the condition was suspended, its non-performance to the full extent is not imputable to the grantee. He stands upon the grant, having done what the law required him to do. Two hundred thousand arpents of the grant are appropriated to emigrant families; eight hundred thousand remain, not to the government, for the grant has separated the entire tract from the public domain. The grantee is under no obligation, express or implied, to settle more than five hundred families; the remainder of the grant, under any construction sanctioned by law or justice, I think, remains to him.

There are no words in this instrument which convey a fee simple at common law, but by the civil law it gives to the grantee, in my judgment, a complete title. No technical terms are necessary, under the civil law, to constitute such a title. The intent of the parties is ascertained by the language of the entire instrument, and effect is given to it accordingly. This mode of construction commends itself to our reason and judgment more strongly than the technical forms of the common law. Whilst the latter are seldom understood by the uninstructed, the former cannot be misapprehended by an individual of ordinary intelligence.

In this grant words are used of strong and decisive import; words which, it is believed, show the intent of the grantor as fully as any that could have been adopted. " Exercising the authority which the king has granted to us, we destine and appropriate, in his royal name, the aforesaid twelve leagues." *To destine* is " to set, ordain, or appoint to a use, purpose, estate, or place." We are all " destined to a future state." " To fix

unalterably by a divine decree, to appoint unalterably." The word *appropriate*, in the sense used, signifies, "to set apart for or assign to a particular use, in exclusion of all other uses"; "to claim or use by an exclusive right." No words of a more determinate character, to convey a complete title, could have been found in any language. The words "*destinamos y apropiamos*," as used in the original grant, mean, "to grant and deliver as property."

In the grant it is said, "We have determined to designate the twelve leagues destined for said establishment," &c. The five hundred families are named, "that the said Baron de Bastrop may establish them in the terms, and under the conditions, which are expressed in the said petition and decree." The intent of the grantor in this is plainly signified. The land granted is called the establishment, — the establishment of the Baron de Bastrop, which is destined and appropriated on condition that he shall establish thereon five hundred families, each having four hundred arpents. In the Spanish forms it is still called the establishment, indicating the terms on which it was granted. Under the Spanish laws and usages, the Baron de Bastrop was a *poblador*, meaning "one that peoples."

Under title 12, lib. 4, of the Recopilacion de Indias, there are several books exclusively devoted to colonization. The viceroys exercised the power and discretion of the king in granting lands, &c., and the governors-general, in the absence of the viceroys, exercised the same powers, and afterwards, also, the intendentes. There was no other limitation of this power "than that of not causing injury to third parties."

"If," says the law, "in that part of the Indies already discovered there be any sites or districts so good that it may be expedient to found settlements there, and any persons should apply themselves to making establishments and neighborhoods upon them, that they may do so with better will and greater usefulness, the viceroys and presidents may give them, in our name, lands, lots, and waters, according to the disposition of the land, so that it be not to the prejudice of any third person, and that it be for the time that it may be our will." Temporary grants were subsequently made perpetual.

The tenth law further provides: "Let the lands be divided without excess between discoverers and ancient pobladores and their descendants, who have to remain on the lands; and let the best qualified be preferred; and let them not have power to sell to church or monastery, or other ecclesiastical person."

I may hazard the assertion, without the fear of successful contradiction, that the remuneration given for colonization, in the Spanish colonies, was uniformly a grant of lands. And

these grants were often made in the form of this grant to the Baron de Bastrop. Indeed, the face of the grant seems to me to admit of no other construction. The twelve leagues square were "destined and appropriated," that is, "granted and delivered as property." To whom? Not to the five hundred families only, for their rights are limited to two hundred thousand arpents. It was destined and appropriated for or to the establishment, including the five hundred families and the Baron de Bastrop, the poblador. There is no want of precision in the grant. The rights of the families being limited, the remainder belongs to the Baron de Bastrop, in full property, subject only to the conditions expressed.

This is the result to which I have been brought by a careful investigation of this case. And I am the more confirmed in this opinion, as it concurs with that which has been expressed by three of the most learned and eminent jurisconsults in Spain. J. F. Pacheco, Manuel Cortina, and S. de Olozaga stand in the front rank of Spanish lawyers. Cortina was formerly minister of justice, the other two have both been prime-ministers. I make these statements from the highest authority of Spain in this country.

The opinions referred to are not authenticated so as to make them evidence. But as I have arrived at the same conclusion to which they came on a construction of the grant, I will extract from their opinion one or two sentences. "Destining and appropriating the twelve leagues to the establishment of the Baron de Bastrop, means the delivering them to his proprietorship and dominion, he complying with the conditions with which they were petitioned for and granted." And again: "In it [the grant] are employed the words properly called effective, 'to destine and appropriate,' and the last, especially, as well legally as vulgarly, signifies, 'to make the property of,' so that under whatever aspect the question is looked at, the twelve leagues, by virtue of the said concession, became the property of the Baron, and the property which he acquired in them was the allodial and complete property recognized by our laws, without other trammels than those in the general conditions imposed upon all pobladores and the special ones of this case; and it appears that, if these last were not fully complied with, it was not through the fault of the Baron, but through obstacles opposed to him by the authorities of the colony themselves. His failure of compliance cannot prejudice or diminish in the smallest possible degree the right which, by the concession, he undoubtedly acquired."

In this opinion I have the concurrence of my brother McKinley, whose views are embodied in it with my own.

This cause came on to be heard on the transcript of the record from the District Court of the United States for the District of Louisiana, and was argued by counsel. On consideration whereof, it is the opinion of this court, that the title set up of the petitioners is neither a legal nor equitable claim, and is null and void. Whereupon, it is now here ordered and decreed by this court, that the decree of the said District Court in this cause be, and the same is hereby, reversed and annulled, and that this cause be, and the same is hereby, remanded to the said District Court, with directions to dismiss the petition of the claimants.